# Herr's Appeal.

Where a gift by a husband to his wife is reasonable and not in fraud of creditors, equity sustains it as a provision for her, to which the interposition of a trustee is not indispensable; but such gift must be established by clear and convincing proof, not only of the act of donation and delivery, but of her separate custody of it.

APPEAL from the decree of the Orphans' Court of *Lancaster* county, upon the settlement of the account of Frances Herr, administratrix of Samuel Herr, deceased.

The exception by the heir at law was, that the accountant had not charged herself with the sum of $5000 cash on hand at the death of the intestate. The accountant was the widow of the intestate, and admitted that there was between $4000 and $5000 in gold and silver, which was not taken into the inventory, and which she claimed as her own, by virtue of a gift to her by her husband in his lifetime; and to maintain this, she gave the following evidence:

Christian Herr, sworn. " When my neighbour Lehman was sick, Samuel Herr came up to my house, says he ' if Lehman were to die, you would buy the place.' I told him if I had the money. (This was Samuel Herr, miller, of Strasburg, deceased.) Lehman died, and I did buy the place. I then went to Samuel Herr, told him that I had bought the place now, and that he promised me some money. He said he had none, but there was some silver in the house he said, and that was Fanny's, (meaning his wife), and she would give it to nobody."

J. Bowermaster, sworn. " Samuel Herr and I were riding to Frank's vendue, when he said I was in the same situation that he was, had no children, and he would ask me a question. He then

asked me what I would do with my estate when I did not want it any more myself; I told him I would give it to them that had done the most for me and stood the most need of it. He then said, very well, I believe I will do so too, I would not wish the Herrs to have any of it, for they wronged my father before me, and now they are trying to rob me too if they can. Samuel Herr was a man at that time who drank hard."

Mary Long, affirmed. "I lived at Samuel Herr's at the time of his death. I had lived there about six years before. About that money, I knew that he had the money, that he made no use of it. It was kept in the lower bottom of a double-bottomed chest; some was in bags and some was tied up in cloths. Silver was what I seen. I didn't see gold. I did not see it opened. They were saying that there was gold amongst it. The chest was up stairs; his wife kept the key of the room. I helped Samuel Herr to count once when he put it there. I knew that his father-in-law was about buying Lehman's property, and that Samuel Herr had promised him some money, and was giving himself trouble about it; he couldn't get money in for him. I knew then that he had this silver, but he didn't want to part with it. All was appraised at the appraisement except this silver, that was not given. The drawers and bureaus were all opened at the appraisement, and Mrs Herr was present." Ques. "How long was it since you helped Samuel Herr to put this money in the chest, and how much was there?" Ans. "I seen him take the moneys to the chest. I helped to select it, but how much I don't know; it was over $100; it was before his father-in-law bought the place. I heard Mr and Mrs Herr say there was gold there, but I never heard how much. I seen him after we picked the money, go into the room where the chest was. As near as I know, I heard them say it was between $4000 and $5000, but I can't say to a dollar." Ques. "Did Samuel Herr use this money?" Ans. "No sir; if he would have wanted to use the money, he would have given it to his father-in-law when he bought the place, and not troubled himself that he couldn't eat or sleep because he couldn't get in the money for him. Mrs Herr always kept the key of the chest. Mr Herr got it from her when he wanted it. She didn't keep the key of the desk. Mrs Herr was along when we were counting the money of which I have been speaking, but whether she was along when he put it in the chest, I don't know. Samuel Herr was a drinking man towards the last. He and his wife when he was sober were on good terms; when intoxicated, he was crabbed like other men. Sometimes hard words passed when he was intoxicated. He was a man that handled a great deal of money."

Fanny Herr, affirmed. "I lived ten years with Samuel Herr. I often heard them talking about money. I saw the chest the money was kept in; it was a large old-fashioned chest. The key of the chest was a large key. The chest was generally kept locked.

Fanny Herr kept the key, and her husband, Samuel Herr, knew where it was kept, and could get it whenever he wanted it. Mrs Herr never carried the key with her. The door of the room in which the chest was kept was generally locked. The key of the door was such as is generally used for locking doors. Samuel Herr could go into the room at any time he wanted. He knew where the key was kept. I have seen Samuel Herr go into the room frequently; sometimes, Mrs Herr was along, and sometimes he went in by himself. I have seen Samuel Herr abuse his wife. They did not live together as man and wife ought to live. I have often heard him scold her, and sometimes she would get cross and scold back, too. I saw him at one time, whilst at dinner table, throw a bowl of milk in her face. I have frequently seen him strike and box her about in the kitchen. I have known him to lock her out of the room, when he went to bed at night, and not let her in. Mary Keen, now Mary Long, lived there at the time I did, and when they, (that is, Samuel Herr and his wife), quarrelled, Mary generally took her part. I heard him frequently cursing and damning the New Menonists,—meaning his wife and Polly Keen, as Mary Long was then called. I heard Samuel often tell his wife that she should go and leave him, go home to her father's and stay there. I left there about five months ago, and am now past eighteen years of age. I never heard Mrs Herr say that the money in the chest was hers. I often felt ashamed at the way they scolded each other. Polly Keen was often present when they were scolding. Mrs Herr sometimes made me presents, such as a dress or handkerchief. The chest in which the money was in, which I have heard them talk about, was kept up stairs."

Mary Long, affirmed. "I lived with Samuel Herr and his widow about nine years. I heard that there was between $4000 and $5000 kept in a chest in the house; it was an old-fashioned chest, I think a walnut one. The chest was kept locked. I have often seen the key; it was a tolerable large key. I have seen Samuel Herr go into the room and take money in. I do not know whether Mrs Herr was with him or not. I helped Samuel to select the money at the time I just spoke of. I was in the room with him. He had the money in his desk, perhaps for some time, I cannot say how long, before he took it out and put it in the chest. I seen the money; it was silver; I do not recollect the amount. He gave me fifty cents for helping to count or select it. I never heard Mrs Herr claim the money in the chest as hers previous to his death. I often thought that he went on too bad, scolding his wife when he was in liquor. I do not know of more than one or two nights that he locked the door of his room, and would sleep by himself, and would not let her in. I do not recollect of Samuel Herr having his wife's horse brought out to the door saddled, and counting down the money he got with her, for her to take and go home. There was so many things happened

[Herr's Appeal.]

there, that I cannot mind them particularly. Something of the kind might have happened, but I cannot say whether it did or not. I think that the same key that locked the chest, also locked the door of the room it was kept in up stairs."

David Row, sworn. "I have known the family. of Samuel Herr, the intestate, from the year 1826, or may be longer. Seven years since, I understood that there was a certain amount, somewhere in the neighbourhood of $5000, in hard stuff, in gold and silver, that he had intended for his wife. The reason that I understood it was for her was, he had a certain sum of money to make up that he promised to lend away, and he had a good deal of difficulty in getting the money, and he was obliged to take it out of the bank. He was a man wanted very little to do with banks. He never owned a share in a bank, nor never had any dealings with them, not previous, to my knowledge, but at that time he would sooner do it than take that money. He was a man of his word; was a good deal bothered about making up this money before the time came. He was a responsible man, and would always perform when he made a promise. Then it went off and on, till some time may be, 1836. During this time I understood, this money was his wife's. I understood this from him. Shortly before he deceased, he was down in Philadelphia on business of some flour that he had taken down. He met me at the plane, where I was working. This was in the year 1836. As we were coming out, we were talking of money matters. I asked him then, whether he got silver there or hard money? He told me not. I told him, I supposed he had plenty at home. He then told me, that there was some there, but he had no say to it; he had nothing to do with it; that it was not his; told me to recollect that it was his wife's. I knew that money was there. He never touched it, in my opinion. It was in a chest up stairs; but it was a thing that was kept a secret, and I didn't pry into it. I knew at the time he sent me to collect the money, that that money was there in the house; but he said, he would sooner borrow the money out of the bank, or do anything rather than touch that money."

Henry Brooke, affirmed. "I hired with Samuel Herr, as miller for him, in 1836. After I had been there a month or so, a book pedlar came along there; he had books. There was a book I wished to purchase. I hadn't just the change, and I asked Samuel Herr for it. I asked him for two dollars. He gave me a five dollar note. I told him I didn't want so much as that. He said then to me, he had silver in the house, but he would rather give me the five dollar note than to take of that; that he had given it to his wife; that it was hers; that if I would buy the book, and hadn't use for the change, I should give it to him, if I got silver. The harvest before he died I was working on the saw-mill, taking off some boards, and I got my wrist cut, and was obliged to apply to Dr Musser. After the wrist got well, I told him I

wanted to get a little money to pay the doctor; it was just a dollar I wanted, and he gave me a five dollar note, that time, again, and told me to return the change again to him—that is, if I didn't want more than a dollar; for he said that he wanted to have all the silver and gold for his old woman, he said to me. The silver that we would get in the mill, we generally paid him, or gave him the money every Saturday evening, and when we would give it to him, he would say, ' This I must lay away for the old woman.' Samuel Herr drank some, but I never saw him, when others thought he couldn't attend to his business."

David Eberly, affirmed. " I moved to Samuel Herr's property the 1st April 1836. I remained there during his life. I worked for him days' work. I heard him say that he had several thousand dollars of hard money laid away for his wife. I heard him say so several times. I heard him talk of making a will, at one time; but he did not allow any of the Herrs anything, except the old schoolmaster, David Herr. He allowed he would leave him a little. He allowed he would leave it to his own wife."

John Eberle, affirmed. " I went to Samuel Herr's to live the 1st January 1836. It was the last year of his life. He sent me collecting; told me I should tell them I must have the money; that he won't wait any longer; he promised a certain man some money, and he didn't want to disappoint him; that there was some money in the house, and that was silver; that that didn't belong to him; that it was his wife's, Fanny; that he had nothing at all to do with it. I often heard him telling, before that, about the money —about the silver. He told me the amount of silver; that it was several thousand; but I can't say exactly the amount that he told me. To the best of my knowledge, he never made use of it. He told me it was his wife's, Fanny."

The court below was of opinion that the evidence was insufficient to entitle the wife to the money in her own right, as a gift from her husband, and therefore charged her with the same.

*Montgomery* and *Stevens*, for appellant, cited 4 *Watts* 150 ; 2 *Stor. Eq.* 596 ; 2 *Kent* 163 ; *Tol. on Exec'rs.* 226 ; 3 *P. Wms* 334 ; 1 *Mad. Chan.* 402 ; 4 *Dess.* 505 ; 1 *Johns. Chan.* 240, 329 ; 15 *Serg. & Rawle* 84 ; 6 *Whart.* 571 ; 2 *Stra.* 955.

*Reigart* and *Parke*, contra, cited 2 *Black. Com.* 440 ; 5 *Whart.* 142 ; 3 *Binn.* 366 ; 3 *Atk.* 400 ; *Tol. on Exec'rs* 224, 235 ; *Reeve's Dom. Rel.* 91 ; 2 *Kent's Com.* 438.

The opinion of the Court was delivered by

Gibson, C. J. — Such a gift as this would certainly be void at law; for not only is the wife's capacity to contract with her husband extinguished by the merger of her legal existence in his, but as her possession is, in contemplation of law, his possession, she is

incapable of receiving from him that delivery and transfer of it, which is essential to this species of contract. But where a gift to the wife is reasonable, and not in fraud of creditors, equity sustains it as a provision for her, to which the interposition of a trustee is not indispensable; yet in consideration of the facility with which evidence of it may be fabricated, resting, as it usually does, on the testimony of witnesses domesticated in the family, and tinctured with the prejudices and partialities of its members, a chancellor exacts clear and convincing proof of the act of donation and delivery, followed by the same custody that a wife has of her wardrobe or the ornaments that belong to her person: in fine, distinct proof of what would constitute a gift to any one else. In a case of the first impression, such as the present happens to be with us, it is excusable to re-assert these text-book principles as the law of the court.

That the coin in question was set apart from the husband's banknotes, which he treated as his proper money by locking them up in his desk and taking the key, has not been denied; at least the fact is borne out by every part of the evidence. This coin was kept in the lower part of a double-bottomed chest, of which the wife kept the key, but to which the husband had access at those times when he visited it to increase the hoard. What more decisive badge of ownership and possession could there be? It is true that he went to the chest indifferently when she was present and when she was absent; but to have watched him on those occasions she may have thought would have evinced an unnatural distrust of one whose acts were intended to benefit her; for though he often put money into it, no witness speaks of having seen him take any out of it. That the parties lived on these terms of unreserved confidence, is a circumstance which corroborates the direct evidence of the gift; and that the husband had occasional access to the chest, is not more inconsistent with the wife's possession than the same sort of access would have been to the place where she kept her apparel. In *Northey* v. *Northey*, (2 *Atk*. 77), where the question was whether certain jewels were part of the wife's paraphernalia, and consequently whether she had retained them in her possession during the husband's life, it was decreed for her, on proof that she had worn them six weeks before his death, and after he had specifically bequeathed them away from her, though he had kept them locked up in his bureau, where they were found by his executor, his custody being deemed her possession. That is a much stronger case than the present, in which the room-door was kept locked by the same key, and in which the wife's general possession is proved by two uncontradicted witnesses.

The evidence of donation rests on the testimony of witnesses who prove not only the husband's declarations of the fact, but acts done by him in conformity to it. Naked declarations of the sort are of less account than acts which, by reason of their greater

notoriety, are less easily misrepresented or misunderstood. Such declarations are sometimes made for the sake of peace; sometimes with a view to future events; and sometimes with no definite purpose whatever, as where a horse, or anything else, is designated as the property of the wife or a particular child: these are idle or unsettled indications of an intended disposition, to which it would be rash to give the effect of proofs. But when they are found to have been acted on as the basis of a fixed determination, they assume a very different aspect. In the case under consideration, the husband kept his own money under lock and key, using it exclusively in the course of his business, and letting no necessity, however pressing, break in on the destined provision for his wife. And so sacred did he consider it, that rather than touch it at his utmost need, he raised money on his note put into bank for discount — a last resource, to which he had evinced, on other occasions, a peculiar repugnance. In lending or paying he parted with no coin, but contrived rather to get it in change, avowedly to increase the cherished store. Now to explain the drift of this, his several declarations to five different witnesses—that the coin was the money of his wife, and that it was collected for her separate use—as well as his declarations to others, that his kindred should not have his property at his death—come into the case with decisive effect. He was childless; and the gift was, not only a natural, but a proper one. This evidence would be sufficient proof of a gift to a stranger: then why not sufficient proof of a gift to one standing in a relation so intimate?

The appellees oppose to it the improbability of such a thing from a husband who is proved to have abused her, when he was drunk, with words and blows. Had it been proved that he did so when he was sober, there would have been matter in it; but the very consciousness of his brutality may have led him, in his moments of sobriety, to make the provision he did, in atonement of her wrongs; so that this feature of the case rather strengthens the evidence of the gift than weakens it. It is in proof that he treated her well when he was sober; and though drunkenness commonly transforms a civilized man into a savage, and a kind husband into a beast, the transformation seldom survives the debauch that occasioned it. The proof of its occasional occurrence, in this instance, is not enough to overbear the positive, distinct, and full proof of the fact it is adduced to encounter. The other exceptions are not sustained; but the item of $4500, charged as part of the husband's estate, must be struck out of the auditor's report, and the decree affirmed for the residue.

So decreed.