# Kaufmann's Estate.

*Appeals—Findings of facts by orphans' court—Inferences—Presumption.*

1. Findings of fact by the orphans' court when supported by competent evidence are as binding on the appellate court as the verdict of a jury.

2. If there is no testimony to support a finding made, or if that reached, is inconsistent with another as to a material matter, it cannot be sustained; and the inferences, deductions or conclusions from reasonings have no binding effect on appeal.

3. There is no presumption that the application of legal principles to the facts found is correct.

*Appeals—Position on appeal different from that in court below.*

4. Ordinarily an appellant is bound by the position taken in the lower court, and upon the basis of which the trial was had.

*Decedents' estates—Gift by decedent to daughter—Parent and child—Evidence—Burden of proof—Continuance of conditions—Intention to give—Presumption—Declarations—Hearsay.*

5. To make a valid gift inter vivos, there must be a clear, satisfactory and unmistakable intention of the giver to part with and

surrender dominion over the subject of the gift, with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery.

6. There is no presumption of an intention to give, and the purpose to do so, followed by an actual or constructive delivery must be shown, and the burden of proving both of the necessary elements rests on the alleged donee.

7. The quantity of testimony required is not so great, where the relation of parent and child exists.

8. If the transfer is shown to be complete, and the holding is alleged to be on condition, the burden then shifts to the one so asserting.

9. Mere admission by the donor of a transfer, or declarations on his part of an intent to do so, are not necessarily sufficient.

10. Once the gift has been legally established, the mere fact that access was given the donor to the box in which the subject of the gift was deposited, will not change the character of the transaction.

11. Prior to complete surrender, the donor may alter his intention, and retake the subject-matter, or thereafter the donee may return it, thus releasing the right of ownership.

12. In law there is a presumption of the continuance of conditions once shown to have existed, and the ownership of property proven to have been in one, is supposed to there remain until the contrary is made to appear.

13. If the possession of the property is found in the hands of the donor, the law will assume that he retained title.

14. As making more definite and significant the nature of a person's property, acts and declarations of claim of title by such person may be decisive, and should therefore be considered for that purpose, without, however, conceding to them any force as hearsay assertions.

15. Self-serving statements are ordinarily not receivable to establish title in the one making them, unless in the presence of the adverse party; but previous declarations which indicate an intention to give, or the lack of such purpose, are receivable in evidence.

16. Where a party is in actual possession, his statements are admissible to show title to the property in him.

17. A daughter cannot claim securities as a gift from her deceased father, where it appears that no undivided control of them was ever given to her, that the father secured exclusive possession of them, and continued to hold possession until his death, and that the facts and declarations clearly indicated no intention on the part of the father to deliver them as a gift presently in his lifetime.

Argued October 14, 1924. Appeal, No. 100, Oct. T., 1924, by Lillian S. Kaufmann, daughter of decedent, from decree of O. C. Allegheny Co., April T., 1923, No. 315, dismissing exceptions to adjudication in estate of Isaac Kaufmann, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Petition to direct executor to deliver securities.
Exceptions to adjudication of TRIMBLE, J.
The opinion of the Supreme Court states the facts.
Exceptions dismissed. Lillian S. Kaufmann, daughter of decedent, petitioner, appealed.

*Error assigned* was, inter alia, decree, quoting record.

*M. W. Acheson, Jr.,* of *Sterrett & Acheson,* with him *Joseph Stadtfeld* and *Eugene B. Strassburger,* for appellant.—"Lillian S. Kaufmann" inscribed on the envelope containing the payable-to-bearer res deposited by her father's hand in her presence in her box, conclusively imported a gift thereof from him to her: Yeager's Est., 273 Pa. 359; Reese v. Trust Co., 218 Pa. 150.

Lillian Kaufmann's act on June 30, 1916, deputizing her father in respect of the box enclosing the res and his accepting the deputization show he had parted with control of the res: Reese v. Trust Co., 218 Pa. 150; Herr's App., 5 W. & S. 494.

Isaac Kaufmann's having no right to collect the dividends on the fifteen thousand shares and to that end to have the shares transferred to himself, was why Mr. Brown advised against Isaac Kaufmann's getting the securities out of the box and insisted only Lillian Kaufmann might properly get them.

The very fact that Isaac Kaufmann applied to his daughter to consent to this transfer of these shares to him, is cogent evidence that she owned the notes.

*Thomas Patterson,* of *Patterson, Crawford, Miller &
Arensberg,* with him *Reed, Smith, Shaw & McClay,* for
appellees.—No gift was established: Packer v. Clemson,
369 Pa. 1; Campbell's Est., 7 Pa. 100; Schiehl's Est., 179
Pa. 308; Sampson v. Sampson, 4 S. & R. 329; Myers'
Est., 248 Pa. 76; Armstrong & Latta v. Phila., 249 Pa.
39; Achenbach v. Stoddard, 253 Pa. 338; Weiskircher
v. Connelly, 256 Pa. 387.

OPINION BY MR. JUSTICE SADLER, November 24, 1924:
A petition was presented by Lillian S. Kaufmann to
the Orphans' Court of Allegheny County praying that
securities to the amount of one million dollars, which
had been inventoried as part of her father's estate, be
returned to her, claiming their ownership by reason of
a gift alleged to have been made some years before his
death. The case was ably presented by counsel, and
carefully considered by the learned court below. In-
deed, so solicitous was the latter to arrive at a correct
determination that, after filing an opinion refusing the
prayer of the petitioner, permission was given to re-
open the hearing so that claimant could deny certain
statements made by a material witness for the respond-
ents, though she had full opportunity to do so when
called at the first trial. A reargument resulted, and
again a deliverance was made, in which the same con-
clusion was reached as previously, and the order entered
was subsequently approved by the court in banc. This
appeal followed.

Seventy-four assignments of error have been filed. To
consider these separately, within the compass of this
opinion, is manifestly impossible. All have been ex-
amined, and, with the exception of complaints to the
admission of certain testimony which we consider later,
are found to fall into two classes. One relates to find-
ings of fact, and the inferences drawn therefrom, and
the other to conclusions of law, by which the legal effect
of these facts is declared. It must be borne in mind

that the former are as binding on us as would be the verdict of a jury, where supported by competent evidence: Miller's Est., 279 Pa. 30; Keally's Est., 275 Pa. 455. Of course, if there is no testimony to support a finding made (McConville v. Ingham, 268 Pa. 507), or if that reached is inconsistent with another as to a material matter (Gassner v. Gassner, 280 Pa. 313), it cannot be sustained; and the inferences, deductions or conclusions from reasoning have no binding effect on appeal: Gongaware's Est., 265 Pa. 512; Miller's Est., supra. There is no presumption that the application of legal principles to the facts found is correct.

Isaac Kaufmann, a prosperous business man, in the City of Pittsburgh, had been a member of a partnership conducting a mercantile business there. In 1913, it was taken over by a corporation then formed, and the stock of the company was received in payment for his interest in the goodwill. Other property of the firm, on hand at the time, was also purchased, but paid for in a different manner. His holdings of the corporate securities to the amount of 15,000 shares were sold to his son-in-law, Edgar, the husband of Lillian, the present claimant, an only child by his first wife. He received from the purchaser in payment twenty notes, maturing at various times over a period of many years, the stock bought being deposited as collateral. When he died in 1921, both the original obligations, and the security accompanying,—the certificates, in the meantime, having been transferred to his name on the books of the company,— were found in the vault at his home, and included in the inventory of the estate. By his will, disposing of property valued at several millions he made generous provision for his second wife, thereafter giving practically all of the balance for the use of his daughter, the present petitioner, and her son, but the widow elected to take against it. Lillian now alleges the purchase-money notes, executed by her husband, Edgar, above referred to, with the collateral attached, are her individual prop-

erty, by reason of a gift made in 1916, and therefore constitute no part of the estate. She asks that they be returned by the executors.

It may be observed first that the petitioner averred an absolute transfer, and the fact of non-possession of the securities by the donee was explained by alleging the decedent forcibly broke open the receptacle in which the notes and stock were contained, and wrongfully took possession of them. The redelivery of the collateral stock, for the purpose of transfer, so that dividends might be collected during the absence of the pledgor,— the proceeds to be applied to other debts,—was conceded, though no explanation appears of the failure to gain repossession of the new certificates, when the change of ownership on the books of the company brought about the contemplated result. Nor is there any admission made of any consent to the taking of the notes. On the theory of a misappropriation by the father of the daughter's property, the case was heard and disposed of below, and it is insisted by appellees that it is too late for claimant to base her argument here on some different ground. Ordinarily, appellant is bound by the position first assumed, and upon which basis the trial was had (Armstrong & Latta v. Phila., 249 Pa. 39; Weiskircher v. Connelly, 256 Pa. 387; Salonic v. Weiswasser, 82 Pa. Superior Ct. 279), but we are unwilling to apply this rule in the present instance, since it was contended by appellant, as appears by the pleadings, that there had been a valid, executed and irrevocable gift, and what occurred thereafter as to possession is immaterial. The fact that it clearly appeared there was no wrongdoing is suggestive when we come to consider the merits of the case.

It is apparent that the decedent was anxious, for some reason, to segregate, from the remaining portion of his estate, the sum represented by the promissory notes, and we think the testimony furnishes a reasonable explanation of his motive, as will hereafter be shown. In

1916, he transferred the envelope, containing these securities, from the bank, where they had been kept, to his office in the department store. According to the testimony of his secretary, Sigal, an inventory of his personal estate was prepared on June 1st of that year, and this asset was not included. On June 30th, as stated by the same witness, he was told to bring the package containing the notes and stock in question, upon the back of which had been written the name of Lillian S. Kaufmann, to the Union Savings Bank, and this was done. There, the decedent rented a small box in the vault, the daughter, who was present, being designated as lessee, and the envelope placed therein. The bills for the rent, subsequently accruing, were sent to the father, who paid at least part of them. The notes in the envelope were not endorsed to her, nor had the certificates of stock been transferred, though the powers of attorney, authorizing this to be done, were executed in blank by Edgar, in whose name the certificates had been issued. Keys were given to both, and a power of attorney was signed by Lillian authorizing the father as her attorney "to open and have access to and control of the contents," and "to do all acts necessary for that purpose." In so far as appears from the record, no statements were made at the time disclosing the purpose in depositing the securities.

To show that a gift was intended, certain declarations of the decedent—known to be a reserved and reticent man,—before and after June 30, 1916, were rehearsed by witnesses, and certain inventories were offered, showing no reference to the obligations as a part of Isaac's personal estate. In one case, an item, referring to it, was crossed out. Sigal, the secretary, testified the decedent had stated, in the spring of 1916, that he intended to give the notes and stocks to Lillian, though, in his later examination, he fixed the time as simultaneous with the preparation of the inventory on June 1, 1916. No further oral evidence was offered to indicate an intention to make a gift inter vivos. It was followed, however, by

the testimony of certain witnesses, who told of state-
ments disclosing a recognition of the fact that a gift had
been made.    Mrs. Cotts, a stenographer, and subse-
quently private secretary for the decedent, testified that
the latter declared he had made a gift to his daughter,
Lillian, of a million dollars.    Charles Cline said that, in
the fall of 1916, he spoke of the beautiful gift that had
been given to Lillian which was admitted by Kaufmann,
but there was no identification of the present supposed
donation.    Mrs. Wagman, a welfare worker in the de-
partment store, testified she overheard a conversation
between the decedent and his stenographer, sometime
between 1916 and 1918, in which the former stated "that
pertains to the gift, the million dollar gift I gave to
Lillian."    Miss Kress, an office manager in the store,
claimed to have been told by the decedent, "I gave
Lillian the million dollar notes."    Henry Kaufmann, a
brother, related a conversation, in connection with a sug-
gestion made by him at the end of 1919, that investments
be made with the dividends about to be received on the
department store stock, and of being told, in response,
by Isaac, that he had given "that to Lillian."    His testi-
mony was much confused, and two witnesses for the re-
spondents testified to a conversation with him in which
he stated that he knew nothing about it.    The last wit-
ness, whose credibility was doubted by the court below,
with good reason, as will be noted later, was Dudick, the
chauffeur of Kaufmann, who told of driving him and
two others in 1919, and that Sigal, one of the occupants
of the car, asked Strauss, a guest in the machine, "if he
heard about the million dollar gift [Kaufmann] made to
his daughter," and that the decedent admitted this was
so.    This report of the conversation is not in accord with
the testimony of Sigal, who stated that he had no con-
versation with relation to any gift after June 30, 1916.
Further, there was offered in evidence inventories, in ad-
dition to the one already noticed of the personal estate
of Isaac, of October, 1916, and yearly thereafter, until

1919, in which the particular asset in question was not entered. A statement of indebtedness due by Edgar to his father-in-law was produced, and an examination shows it to refer only to bank claims, payment of premiums on insurance policies held as collateral, and certain advances made.

From this evidence, the court below was asked to find a completed and executed gift, and therefore to hold that proof of acts subsequent to June 30, 1916, and declarations of the alleged donor to show ownership could not be established to explain the transaction. The testimony offered was received, and the legal correctness of its admission will be hereafter considered. The relations between the decedent and his daughter and her son were most friendly and affectionate, and in the former he placed the greatest confidence, and, doubtless, he intended ultimately to make ample provision for their support, as clearly appears from his will. In considering the disposition of his estate, he frequently consulted counsel as to the creation of a trust, to include the assets now in dispute, so arranged as to be exempt from possible liability for inheritance taxes. Of this he also spoke to his auditor, Mr. Burton, as well as Mr. Brown, his attorney. It will be noted that, after advising with them, and no feasible suggestion having been made to carry out his thought, he replaced the item in his inventory, and, when dividends were first declared on the stock in the beginning of 1920, and the sums paid on the 15,000 shares of stock, held as collateral, were received, he accounted for the amount in his personal income tax report for the following year. That, in his opinion, he had in no way parted with ownership by gift to Lillian, is apparent from his declarations to his wife, lawyer and Burton.

In 1918, Edgar proposed to enlist in the army, a course opposed by his father-in-law in view of the possible effect on the large business interests of which he was manager, and in which Isaac was deeply concerned by reason of

his investments.  At that time Edgar was indebted to banks in the City of Pittsburgh for more than $700,000, the decedent being endorser for $250,000, and for these loans certain collateral was deposited.  The creditors desired payment in full or in part, and, to satisfy their demand, Isaac took upon himself the liability, later giving his own notes in payment of the balance, holding the old ones, with the collateral deposited therewith, as security for the new obligations.  These arrangements were made by his attorney, Mr. Brown, with the banks, and in the total of Isaac's assets shown, so that the accommodation might be granted, the debt of $1,000,000 due him was included.

Prior to Edgar's departure for war on June 26, 1918, a conference,—Lillian being present,—was held in Mr. Brown's office, and the indebtedness, at least to the banks, was talked over.  During that discussion, the daughter "took exception to her father's statement about all he had done, sacrificed in this matter and other matters, seemed to get quite angry and said,—or did get quite angry and accused her father of never having done anything for Edgar and herself, except to run him deep into debt, that he was deeply involved in the store transactions, when they had every reason to expect and did expect he was going to give to Edgar his interest in this store or a substantial part of it": Testimony of Mr. Brown, Record 227a.  Lillian, when examined at the second hearing,—supported by her husband, called as a witness,—denied making this statement, claiming the remark was that her father had never done anything financially for Edgar.

After the assumption of liability for the bank indebtedness, in view of the promises to make certain annual payments on account of the principal, if dividends were declared on the stock of the Kaufmann Stores Company, the decedent was advised to have the 15,000 shares of stock, held as collateral for the million dollars of notes, transferred to himself, the power of attorney authoriz-

ing this having been endorsed in blank. When so urged by his counsel, he stated that they were in a box held in the name of Lillian, and that he would have to get her to deliver them which he knew she would willingly do upon request. Subsequently, they were turned over, the father stating, according to the testimony of Mrs. Cotts, claimant's witness, that "she [Lillian], had given the stock to him." There can be no doubt that he had actual possession on December 11, 1918, and that the stock itself was transferred on the books of the company, and the new certificates returned to him on January 6, 1919. Within a few days the notes, with the newly issued stock, were handed to Mr. Brown, for the purpose of drawing an agreement extending the time of payment, and remained in his possession until after February, 1920, when they were returned by him to the home of the decedent, placed in his vault, were there found intact after his death, and delivered to the executors.

Particular reference is made to these facts in view of the claim of the petitioner, as set forth in her pleadings, that the notes and collateral were taken by her father, who, she alleges, forcibly broke into the box at the bank and removed them on February 11, 1920. This was the explanation given by her for a failure to have the possession of the alleged gift at the time of his death. She did say in her petition that she consented in 1919 to the transfer of the stock into the name of her father, so that he might have voting power and receive contemplated dividends to apply to her husband's debts, but did not admit that she gave up the possession of the notes at that time. From all the facts, it is clear the stock must have come into the possession of the decedent long before the time of his death, as found by the court below. In February, 1920, Isaac went to the bank and surrendered the box previously rented in the name of Lillian, which at that time was empty, giving as a reason to the vault officers that it was no longer of use. The key which he had possessed was lost, and it was necessary that the box

be broken. This was done by employees of the bank, the cost thereof paid by Isaac, and further rights therein surrendered.

To sustain the claim of petitioner, that she was fraudulently deprived of the possession of the notes and stock, the chauffeur, Dudick, was called, and testified that Kaufmann took from the box an envelope, which he handed to him stating it contained a million dollars. Further, witness said he could see gold-looking paper through a break in the cover. He carried it to his employer's home in the car, and then handed it to Kaufmann, who repeated the remark. His story is so improbable, and so flatly contradicted by the facts in the case, as to fully justify the learned court below in holding that his testimony was not credible.

One other fact is worthy of notice. In so far as the evidence shows, no claim was at any time made by Lillian for the possession of the notes and collateral, though her petition sets forth a consent to the taking of the stock for retransfer purposes. It is true that Edgar wrote a letter in 1921 to counsel for Kaufmann making a claim to ownership in his wife, but, so far as appears, the decedent had no knowledge of such demand, nor were the executors notified until nearly two years after the death, and it is also to be noted in this connection that, when Edgar returned from the war in 1919, long after the supposed transfer of the notes to his wife, which occurred in 1916, he requested of decedent an extension of six years in the time of their payment, and, at a subsequent date, demanded that a credit be given on the debt represented thereby to the amount of $40,000.

The business of the alleged donor had been performed for years by John D. Brown, his attorney, also a close personal friend, with whom his affairs were intimately discussed. His testimony is full, complete, and, as found by the court below, credible. It makes clear the purpose decedent had in mind, when the notes and stock were deposited, and the proceedings which followed, and

leads, we think, inevitably to the conclusion which justice requires should be reached in this case. The decedent evidently desired to segregate this particular fund, so that a trust could be formed, in some legal way, by which he could retain control of the property during life, and, at his death, it would pass free from succession taxes. It was apparently his thought that Lillian could be safely used as a medium for the carrying out of his desire, and she would comply with whatever his wishes might be. When his plan was shown to be impossible, under the law, he resumed control of the subject-matter, never having parted with complete dominion over it, as shown by his declarations and acts, and was in possession of it when he died.

The first question to be determined is whether the placing of the endorsed envelope, containing the securities, in the box rented in Lillian's name, but over which the decedent continued joint control, constituted a complete, executed and irrevocable transfer. "To make a valid gift inter vivos there must be a clear, satisfactory and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift, with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery": Packer v. Clemson, 269 Pa. 1, 3. The absolute control must be vested in the donee (Maxler v. Hawk, 233 Pa. 316; Ashman's Est., 223 Pa. 543), and if all dominion is not divested, the proposed gift is incomplete: Walsh's Est., 122 Pa. 177. There is no presumption of any intention to give (McConville v. Ingham, 268 Pa. 507), and the purpose to do so, followed by an actual or constructive delivery, must be shown (Yeager's Est., 273 Pa. 359), and the burden of proving both of the necessary elements rests on the alleged donee: Maxler v. Hawk, supra; King v. King, 273 Pa. 351. The quantum of testimony required is not, however, so great where, as here, the relation of parent and child exists: Northern Trust Company v. Huber, 274 Pa. 329; Yea-

ger's Est., supra. In any case, if the transfer is shown to be complete, and the holding is alleged to be on condition, the burden then shifts to the one so asserting: Crosetti's Estate, 211 Pa. 490. Mere admissions of a transfer, or declarations by a donor of an intent to do so, are not necessarily sufficient: Leitch v. Diamond National Bank, 234 Pa. 557; Wise's Est., 182 Pa. 168; Herr's App., 5 W. & S. 494, 28 C. J. 681. Once the gift has been legally established, the mere fact that access to the box, at the place of deposit, is given the former owner will not change the character of the transaction: Reese v. Phila. T., S. D. & I. Co., 218 Pa. 150; Cooper's Est., 263 Pa. 37; Beaumont v. Beaumont, 152 Fed. R. 55.

Prior to complete surrender, the donor may alter his intention, and retake the subject-matter of the gift into his own possession (Cooper's Est., supra), or, thereafter, the donee may return it, thus releasing any right of ownership: Myer's Est., 248 Pa. 76. In the instant case, the notes and stocks were admittedly at one time owned by the father, and were found in his possession at the time of death. In law, there is a presumption of the continuance of conditions once shown to exist, and the ownership of property proven to be in one, is supposed to remain there until the contrary is made to appear: McConville v. Ingham, supra; Hartman v. Pittsburgh I. Plane Co., 11 Pa. Superior Ct. 438. As a result, if the possession of the property is found in the hands of the donor, the law will assume he retained title: Campbell's Est., 7 Pa. 100; Reading Trust Co. v. Thompson, 254 Pa. 333. Likewise, if the donee has the possession of property, delivered without proof of explanatory words limiting his interest, a transfer of ownership is to be understood: Yeager's Est., supra; Northern Trust Co. v. Huber, supra.

"One in possession of property is presumed to be the owner of it. As making more definite and significant the nature of the person's custody or occupation, and as giving it the significance of an exclusive control and of a

possession in the fullest sense, the acts and declarations of claim of title by the occupant may be decisive, and should therefore be considered for that purpose, without, however, conceding to them any force as hearsay assertions": 3 Wigmore on Evidence, 2d ed., section 1779, p. 799.  "The act of delivery or receipt may be in itself entirely ambiguous, if not meaningless.  To make the act intelligible, to give it point and certainty, to indicate with clearness its legal consequences, it is quite necessary to know with what animus the act is done.  Where, therefore,......negotiable or written instruments, or the like, are shown to have been delivered or received, an extra judicial statement showing the intent or intention with which the act is done is also regarded as admissible. ......The existence of a previous mental state to an effect different from that with which it is claimed a given delivery was made may be an independently relevant fact, and be shown by the extra-judicial declarations of the grantor": 4 Chamberlayne on Evidence, sec. 2664.

Self-serving statements are ordinarily not receivable to establish title in the one making them, unless in the presence of the adverse party: Wonsetler v. Wonsetler, 23 Pa. Superior Ct. 321.  The previous declarations, which indicate an intent to give, or the lack of such purpose, are receivable in evidence: Campbell's Est., 274 Pa. 546; Sherman v. Stoner, 78 Pa. Superior Ct. 189.  And where the party is in actual possession, his statements are admissible to show title to the property in him: Scheid v. Storch, 271 Pa. 496.  Such evidence has been considered in a number of cases which have come before us, where the question of a possible gift has been involved: Leitch v. Diamond National Bank, 234 Pa. 557; Robinson v. Powell, 210 Pa. 232; Schiehl's Est., 179 Pa. 308; Sampson v. Sampson, 4 S. & R. 329.  In Reese v. Phila. Trust, etc., Co., 218 Pa. 150, relied on by appellant, it was said by Justice STEWART (p. 157) : "It was because the court below extended the inquiry [beyond the question of the actual completion of the gift], and allowed what subse-

quently occurred to overcome the plain and obvious intendment of what was said and done when the gift was made, that a conclusion adverse to the plaintiff was reached. The evidence on this branch of the case was admitted for the purpose of showing that the parties themselves understood the transaction as meaning something different from that indicated by the plain and natural meaning of their words and acts at the time. It is perfectly competent to show this, since the effort of the law is always to develop and give effect to the real purpose of the parties." In the case then under consideration, it was held too great latitude was permitted in the effort made to impeach a gift, which had been shown to be clearly intended, and fully executed by unconditional delivery, the property being, at the death of the donor, in the undisputed possession of the donee. It is true that declarations of a grantor, after parting with his interest, cannot be used to defeat the title of his grantee which has completely passed: Baldwin v. Stier, 191 Pa. 432. There was no sufficient proof in the present case, however, of a complete surrender of ownership, particularly as a presumption to the contrary arose from the fact of possession of the property in question by the decedent, thus distinguishing the Reese Case, referred to, and the court below correctly so found. Under circumstances such as the present record discloses, it was proper to show acts and declarations of the alleged donor to prove the true character of the transaction, and no error was committed in permitting this to be done.

The foregoing discussion covers sufficiently all of the legal propositions raised by the assignments of error, which were deemed of enough importance to be included in the statement of questions involved, and beyond these we are not required to go. We are convinced that a correct determination has been reached. No undivided control of the notes or stock was ever given to the claimant, and the facts and circumstances clearly indicate there was no intention to presently deliver them as a gift.

Decedent again secured possession of them and continued it thereafter, without demand for their surrender, except as noted. This raised a presumption of ownership which was not overcome. It follows that all the assignments of error must be overruled.

The decree is affirmed, and the appeal dismissed at the cost of appellant.