## Sawyer's Estate.

*Gifts inter vivos—Delivery—Gifts of stock.*

1. To constitute a gift *inter vivos*, there must be such an actual or constructive delivery to the donee as divests the donor of all dominion over the gift, beyond the power of revocation, and vests the donee with that dominion.

2. Where decedent delivered to his son-in-law stock certificates and registered bonds, with powers of attorney to transfer duly executed by him and directed him to see that the transfers were properly effected, so as to vest the title in decedent's daughter and certain other legatees, and the son-in-law failed to effect the transfer until two days after decedent's death: *Held*, that, at the death of decedent, the gift was incomplete and title to the securities in question vested in the administrator.

Exceptions to adjudicaton. O. C. Phila. Co., April T., 1924, No. 1612.

Decedent died Nov. 6, 1923, intestate, and letters of administration were granted to his daughter, Grace H. Sawyer, the accountant. He left surviving him five children, Thomas, Lois, Grace, the accountant, Helen and Lida S. Robinson. At the audit of the account, Thomas and Lois endeavored to show that at the time of his death decedent was the registered owner of certain bonds and stocks worth somewhat over $10,000, which, within three days after his death, were transferred to Grace, the accountant, to Helen and Mrs. Robinson in accordance with certain powers of attorney to transfer delivered with the certificates of stock and the bonds to Mr. Robinson, his son-in-law, for that purpose. The Auditing Judge, HENDERSON, J., says in regard to this matter, in his adjudication, as follows:

The status of all these various stocks and bonds is the same, and it has been agreed that I shall dispose of the question of surcharge against Grace, the accountant, for the stocks received by her, and whatever decree is finally entered in the surcharge against her shall, by agreement of the parties, be entered in each of the other proceedings for the return of the securities; in other words, if the surcharge against Grace is finally sustained, that then there shall be entered against each of the other daughters a decree directing them to hand over to the administratrix the respective shares and bond received by them; on the other hand, if the surcharge is refused, then a decree in the collateral proceedings should be entered in favor of the other two sisters.

Before discussing the testimony, I will briefly outline the happenings: It appears that Robinson, the son-in-law, while visiting at the decedent's house about Sept. 27, 1923, had handed to him by the decedent certain envelopes containing these stocks and bond, and on the outside of the envelopes were the names of the daughters in question. Loose powers of attorney in blank to transfer the securities had been executed by the decedent and were in the respective envelopes. He handed these envelopes to Robinson, requesting

him to have his broker make the transfers to the respective daughters. Robinson, instead of attending to this as requested, took the securities to his office in New York, placed them in the safe-deposit box belonging to his firm and did nothing further in reference thereto until three days after the death of the decedent, when he had them transferred to the respective daughters. He was enabled to do so after the death by having a trust company in New York guarantee the signature of the decedent, although Robinson admitted that he did not tell the company of the death of the decedent.

The testimony in reference to these transactions came practically all from Charles H. Robinson, the husband of one of the daughters. Mr. Robinson identified the envelopes, the notations thereon and contents thereof, and they are recited in the record, commencing on page 63, as follows:

One envelope with endorsement thereon "For Helen, 25-S, U. G. I.," which contained a slip of paper with notation "25-S, U. G. I. To go toward paying off the Fairmount Mor. For Hellen K. Sawyer."

Another envelope with endorsement thereon "For Grace, 13-S, P. R. R.," which contained a slip of paper with notation "13-S, P. R. R. To go toward paying off Mort. For Grace H. Sawyer."

Another envelope with endorsement thereon "For Grace, 67-S, P. R. R.," which contained a slip of paper with notation "To go toward paying off mortgage."

Another envelope with endorsement thereon "For Grace, 10-S, N. P. Co.," which contained no slip of paper.

Another envelope with endorsement thereon "For Helen, 1,000 Bond U. S."

"Q. I have here an envelope marked on the outside 'For Helen.' Was this slip of paper inside of that envelope when Mr. Sawyer gave it to you? A. It was. Q. In your opinion, is that his handwriting? A. It is.

"The Court: Why don't you read into the record what is on the slip of paper?

"Mr. Skinner: '25-S, U. G. I. To go toward paying off the Fairmount Mor. for Helen K. Sawyer. And there are some figures here (indicating).

"Q. In the envelope marked for Grace there is a slip of paper 'To go toward paying off mortgage.' In your opinion, is that in Mr. Sawyer's handwriting? A. It is. Q. And the envelope signed 'For Grace, 67 shares P. R. R.,' has a slip inside with notation 'To go toward paying off mortgage.' In your opinion, that is in Mr. Sawyer's handwriting? A. Yes, sir. Q. You say those envelopes contained certificates? A. Yes. Q. Then what did Mr. Sawyer say to you? A. My first objection—I took some little time looking them over, checking them back; I objected to the separate power of attorney and told him it would be very much easier for him to sign the certificates. There would be then no question as to the transfer if the signature was on the certificates themselves, and his reply was, '*This is the way I am doing it.*' Q. Were those powers of attorney witnessed? A. They were not; when they were handed to me, I attached my witnessing signature at that time and in his presence. Q. What did he tell you to do with those securities? A. As near as I can recall his words, to the effect that I was to take them to my brokers in New York and effect the transfer. Q. What did you do with them? A. I took them with me the following day. I stayed over night and left on an early train in the morning and took them to Westfield. That was on a Friday morning. Q. Westfield is your home? A. Yes; and I took them with me to New York and returned to the office on Monday and placed them— that is, later on in the day I had intended to go up to the bank to have the whole thing fixed up. I am a floor member of the firm and was busy through-

out the entire day. I told the treasurer of the company late in the afternoon, when I went down to the vault, that I was taking there and placing in the box of the company certain securities which were in my care."

The witness was asked (page 67): "Q. Why didn't you do with those certificates what you say he told you to do? A. I held them. Q. Why didn't you carry out his instructions? A. I was dilatory in that particular, procrastination. Q. What was your hurry immediately after the death? A. The matter had not been attended to and I took them up; I had talked with one of the assistant secretaries of the trust company sometime previously and I was talking to him that particular day over the telephone and I went up to see him at that time, having occasion in a business matter to go to the office of the Guarantee Trust Company, with which we do a great deal of business, and I took them with me on that day."

The witness testified (page 68): "A. That was a memorandum in the envelope. Q. And you say it was in the handwriting of the decedent? A. Yes, sir. Q. And you understood it contained his instructions? A. No, sir; I did not. Q. What did you understand it might have been then? A. A memorandum that that particular certficate was to go to—is it Helen's name on that one? Q. Yes, here it is (handing witness envelope). A. All I had to do in this particular case was to transfer that certificate to Helen. Q. It was? A. Yes, sir. Q. What were you to do with this memorandum on the inside? A. I passed that over with the certificate to Helen when I received it. Q. When did you expect to pass it over to Helen? A. As soon as I had accomplished the thing I was to do. Q. When did you expect to accomplish it? A. I hoped to have accomplished it long before I did."

At page 70, the witness said: "A. He gave me those certificates with the specific instruction that I was to transfer them. Q. Explain to his Honor why it is you took the certificates of the Pennsylvania Railroad Company, which only could be transferred in Philadelphia, and certificates of the U. G. I. Company, which also could only be transferred in Philadelphia, over to New York to get a trust company to guarantee the signature, when that trust company had no dealings with your father-in-law? A. I am not in Philadelphia, had no facilities here for staying over or doing anything on that matter, and I took them up to the Guarantee Trust Company. Q. But your mission was simply to turn the securities over to Helen Sawyer; why didn't you turn them over to Helen Sawyer and have them transferred in Philadelphia? A. His request was, I should take care of the matter *for him*. Q. He requested they be taken to New York? A. No—Yes, to my brokers. His words were to see whether my brokers could take care of this matter *for him*. Q. What did the brokers have to do with transferring securities in Philadelphia? A. I am giving you his words."

And, at page 72, the witness testified: "Q. Was it a separate power that you saw connected with the certificate? A. Pinned to each certificate was a power of attorney. Q. When you took them to the Guarantee Trust Company to guarantee the signature, did you tell them that Mr. Sawyer was dead? A. I did not. Q. You knew he was dead at that time, didn't you? A. Yes. Q. On these separate stock certificates you say the signature was already there? A. Yes. Q. You witnessed, however, that they were signed, sealed and delivered in your presence; they were not so signed, were they? A. They were signed when they were handed to me. Q. Were they signed in your presence? A. No."

And, at page 75, the witness further testified: "Q. Tell us again what the decedent told you to do when he handed you these certificates? A. 'I have a

### Sawyer's Estate.

little job here for you, I want you to take these certificates to your broker and have them transferred *for me.*' "

And, at page 77, the witness testified: "Q. Why didn't you carry out the instructions on the envelope and deliver them to Helen or leave them in Philadelphia here where they were transferable?

"The Court: Does the envelope direct them to be delivered to Helen?

"Mr. Jenkins: It simply says, 'For Helen.'

"The Court: Then there is no direction to deliver.

"Q. When was that bond actually transferred, and where? A. It was transferred through the Federal Reserve Bank, here in Philadelphia. I cannot give you the date, I don't recall. Q. Did you personally transfer it or your broker? A. Yes, sir; that is, I went once to get the information and mailed the bond to them."

And, at page 83, the witness further testified: "Q. Did your wife know that you had her father's certificates of stock there? A. I don't know. Q. You did not tell her? A. As I recall, I don't think I did; I may have mentioned the fact though, that 'I am taking care *of a matter for your father.*' The question of details, I don't think I discussed with her."

And, at page 88: "Q. When was the first time you mentioned to them (the daughters) anything about this transaction, and what, substantially, did you say? A. I said I had certain certificates *to be transferred,* and just what the detail was and the amounts to be transferred."

These stocks and bond all stood in the name of the decedent at the time of his death and were transferred to the daughters in question three days thereafter, and, hence, I have jurisdiction to determine to whom they belong. In this adjudication, I will first deal with those in the possession of Grace—the accountant, being eighty shares of Pennsylvania Railroad and ten shares of Northern States Power Company, preferred.

In order that her right to these stocks may be maintained, she must show the intention of her father to make the gift and an unconditional delivery thereof to her. Intention and delivery must coincide; intention without delivery is not sufficient, nor would delivery without intention.

The fact that decedent could have effected these gifts by a simpler method will not aid in determining this question. We must test the method adopted by him—a method he refused to have varied in a slight detail when he replied: "This is the way I am doing it."

The intention to give is undoubtedly established by the testimony. The question remains—did he execute this intention to the point of making an irrevocable delivery to the donees in his lifetime?

To answer this question we must examine the proof as to the method of delivery adopted by the decedent. His method was to sign the power of attorney in blank, write on the envelope the name of the donee daughter and hand them to Robinson to have the transfers made, and when made to deliver the certificates to the respective daughters.

This brings me to the question of Robinson's agency to receive the certificates and have the transfers made. Whose agent was he? If the agent of the donees, the delivery was complete, but there is not a word of testimony to warrant such a finding. On the contrary, Robinson's testimony is very explicit that he was acting for the decedent.

He testified (at page 70): "A. His request was I should take care of the matter for him. A. . . . His words were to see whether my brokers could take care of this matter *for him.*"

And, at page 75: "A. . . . I want you to take these certificates to your broker and have them transferred *for me.*"

Sawyer's Estate.

And, at page 83: "A. . . . I am taking care of a matter *for your father*" (the decedent).

Robinson being the agent solely of the donor, the decedent could have demanded the return of the securities, and, hence, there was no irrevocable divesting of dominion.

In Packer *v.* Clemson, 269 Pa. 1, this type of case was distinguished from that case, when the Supreme Court said: "It is not like a gift in possession of an agent of a decedent, unexecuted at the time of decedent's death."

The accountant will be surchaged with the value of the stocks in her possession.

Lida has possession of twenty shares of United States Steel stock, which counsel agreed is now worth 127; these, I find, belonged to the decedent at the time of his death. It will not be necessary to proceed collaterally against her, because she has in her possession less than she will be entitled to in distribution, and, hence, the award to her will be subject to deduction of $2240 and all dividends received by her.

Helen, on the other hand, has in her possession twenty-five shares of United Gas Improvement Company common stock, agreed to be worth 90.50 per share, and $1000 United States 4¼ per cent. Liberty Loan, agreed to be worth 101; these, I find, belonged to the decedent at the time of his death. Helen will be charged in distribution for the United Gas Improvement Company stock $2262.50, and for the $1000 Liberty Bond $1010, together with the dividends and interest actually received by her upon these respective securities. The amount due by Helen in distribution will be considerably less than the amount which she will owe the estate and counsel are willing that I should award the claim against Helen in kind. The details of the claim against Helen will be found on a later page of this adjudication.

These values are ascertained as of February, 1925, and will be found in a letter to G. Herbert Jenkins, Esq., attached hereto and agreed to by Mr. Skinner; they will also be surcharged or charged with the dividends collected thereon and which will be included in the schedule of distribution herein directed to be filed.

*Robert W. Skinner, Jr.,* for exceptants; *G. Herbert Jenkins,* contra.

GEST, J., March 20, 1925.—The adjudication of the Auditing Judge is clear and convincing, and in this opinion we shall merely refer to some of the decisions of the Supreme Court, concerning gifts *inter vivos,* which lay down a rigorous standard of proof, and require it to be clear and satisfactory upon every point essential to title by gift. There must be such an actual or constructive delivery to the donee as divests the donor of all dominion over the subject of the gift, beyond the power of revocation, and invests the donee with that dominion: Sullivan *v.* Hess, 241 Pa. 407; Turner's Estate, 244 Pa. 568. The stocks and bonds which are the subject of this dispute constituted nearly the entire estate of the decedent; they were registered in his name, and it was not until three days after his death that Robinson, who (as the Auditing Judge correctly holds), was the agent of the decedent, and had held the power of attorney for over a month, had them registered and transferred to his wife and two of her sisters. These facts sufficiently distinguish this case from Yeager's Estate,, 273 Pa. 359, and Kaufmann's Estate, 281 Pa. 519, cited by the learned counsel for the exceptants.

The exceptions are dismissed and the adjudication confirmed absolutely.
LAMORELLE, P. J., did not sit.