# 482

DOLLIE M. STINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

M. JOSEPHINE STINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62694, 62695.   Promulgated April 23, 1935.

*A. M. Liveright, Esq.*, for the petitioners.

*Dean P. Kimball, Esq.*, and *Edward C. Adams, Esq.*, for the respondent.

OPINION.

McMAHON: These proceedings, which have been consolidated for hearing and decision, involve the question of whether valid gifts of stock were made to petitioners by their uncle, Charles B. Maxwell, prior to the sale of said stock. Respondent has determined that valid gifts of 1,000 shares of stock of the American Re-Insurance Co., hereinafter referred to as the company, were made to each of the petitioners on or about March 30, 1928, and that upon the sale of this stock in April 1928 each of the petitioners realized a profit of $31,400. Respondent has determined a deficiency against each petitioner for the year 1928 in the amount of $2,253.87, and has asserted a penalty of $563.47 against each of them for failure to file a return.

The petitioners are the nieces of Charles B. Maxwell, who died on or about September 14, 1928. Prior to his death, Maxwell was president of the Moshannon National Bank of Philipsburg, Pennsylvania, and had broad authority at that institution. For a number of years prior to September 14, 1928, the petitioners had made their home with their uncle in Morrisdale, Pennsylvania. During the winter of 1927–1928, M. Josephine Stine, hereinafter referred to as Josephine Stine, was in school at Wellesley, Massachusetts. At the

time the various transactions hereinafter mentioned occurred, Josephine Stine was a minor, becoming of age in August 1929. Dollie M. Stine, hereinafter referred to as Dollie Stine, had attended a finishing school in Wellesley, Massachusetts, at her uncle's expense and had graduated therefrom prior to March 30, 1928.

On January 3, 1928, Charles B. Maxwell was a director in and owned 3,270 shares of common stock of the company. During 1928 Harry Boulton was president and legal counsel of the company, Harry Scott was treasurer, W. B. Athey was secretary, and C. C. De Rosa was auditor. The company's offices were located at 242 South 13th Street, Philadelphia, Pennsylvania.

Early in 1928 Boulton, Scott, Athey, and Maxwell were actively negotiating for the sale of all of the stock of the company to certain New York interests. Meetings to discuss the sale with the prospective purchasers were held in New York and Philadelphia. Maxwell and Boulton attended at least one meeting in New York. As early as February 1928 Boulton and his associates had been offered a price that they were willing to accept, but the purchasers were awaiting the result of an audit of the company's books, which would run through the first quarter, and refused to conclude the sale until the audit was certified to by the auditors. By the latter part of March, however, the parties had agreed upon a minimum and a maximum price, had agreed that an escrow fund would be part of the plan of sale, and had agreed as to the management of the escrow fund, but the exact sale price remained subject to the results of the audit. The first written agreement between the parties was the sale agreement of April 3, 1928. See discussion of this agreement in *Theodore C. Jackson et al., Administrators, Estate of Charles B. Maxwell*, 32 B. T. A. 470, which involves the same alleged gifts.

On or about March 30, 1928, Boulton brought certificates CO56 and CO65, inclusive, representing 1,000 shares of the company's stock, which stood in the name of Charles B. Maxwell, to De Rosa and instructed him to transfer the shares to the name of Dollie Stine. At the same time Boulton handed De Rosa certificates CO66 to CO75, inclusive, representing 1,000 shares of company stock, and instructed him to transfer the certificates from Charles B. Maxwell to Josephine Stine. The aforesaid certificates bore the endorsements of Charles B. Maxwell, but the endorsements were not dated. Pursuant to the instructions received from his superior, De Rosa issued 10 new certificates for 100 shares each, certificates CO761 to CO770, inclusive, in the name of Dollie Stine, and 10 new certificates for 100 shares each, CO771 to CO780, inclusive, in the name of Josephine Stine. These 20 certificates were then delivered to Boulton. Boulton signed the certificates as president, and Scott signed them as treas-

urer. Boulton personally deposited the certificates with the Franklin Fourth Street National Bank of Philadelphia, which had been designated as depositary of the certificates under the sale agreement.

Powers of attorney bearing the signatures of Dollie Stine and Josephine Stine are attached to certificates CO762 and CO771, respectively. The power signed by Dollie Stine covers certificates CO761 to CO770, inclusive, and gives persons other than Maxwell, and each of them, power of attorney, to transfer the 1,000 shares of stock on the books of the company. The power signed by Josephine Stine covers certificates CO771 to CO780, and gives the same persons power of attorney. The signatures were witnessed by H. B. Scott and guaranteed by the Philadelphia National Bank.

The stockholder ledger sheets of the company reflect the transfer of 1,000 shares from C. B. Maxwell to each of his nieces under date of March 30, 1928. The ledger accounts of Dollie Stine and Josephine Stine further show that the certificates standing in their names were surrendered under date of April 16, 1928, and the ledger accounts balanced. On the latter date the stock was delivered to the purchasers and the cash paid for it in consummation of the sale agreement of April 3, 1928, the delivery and payment being effected in Philadelphia at the office of the Franklin Fourth Street National Bank.

Dollie Stine never had manual possession of the 1,000 shares of company stock issued in her name on March 30, 1928, nor was she notified at that time by anybody that such shares had been placed in her name on the books of the corporation. At the time she signed the power of attorney Dollie Stine knew she was signing papers for stock that stood in her name, but she had signed so many instruments and stock transfers for Maxwell that it did not seem extraordinary to her. She signed whatever Maxwell told her to sign.

Josephine Stine never had manual possession of the 1,000 shares of company stock issued in her name on March 30, 1928, nor were stock certificates representing shares of stock in the company delivered to her.

As soon as the sale of the stock was completed Boulton notified some of the stockholders, but not all of them, that the deal had been consummated. No notification was sent to either Dollie or Josephine Stine respecting the sale.

The proceeds of the sale were credited to the account of the Moshannon National Bank with the Franklin Fourth Street National Bank of Philadelphia. The Moshannon National Bank was formally advised of the credit, and later received instructions from H. B. Scott, treasurer of the company, regarding the distribution. Scott submitted a list of names and the amounts to be distributed to the

cashier of the Moshannon National Bank, who, pursuant thereto, distributed $51,330 to each of the Stines by crediting each of their accounts with the bank in this amount under date of April 19, 1928. Dollie Stine received no notice of this deposit to her credit.

On or about April 21, 1928, Maxwell requested Dollie Stine to sign two checks that had already been prepared for her signature. The first check, dated April 21, 1928, was drawn on the Moshannon National Bank in favor of H. B. Scott for $38,335. The endorsement reads: " H. B. Scott, for deposit Penn. Bit. Stock Syndicate." The second check, dated April 21, 1928, was drawn on the Moshannon National Bank in favor of the Moshannon National Bank for $12,995. This check is marked " Paid ", and marked by perforation, " Paid April 23, 1928." Dollie Stine signed both checks as requested by her uncle and returned the checks to him. At the time she signed the checks she did not know that she had an account of that size at the bank.

The Penn Bituminous Stock Syndicate was used by Maxwell and Boulton, together and singly, in buying Penn Bituminous stock. The ledger account of this Syndicate with the Moshannon National Bank reflects a deposit in the account of $115,005 on April 23, 1923. The deposit was made up from the following checks:

| | |
|---|---|
| H. B. Scott | $38,335 |
| C. B. Maxwell | 38,335 |
| Harry Boulton | 38,335 |
| | 115,005 |

Charles B. Maxwell's individual account with the Moshannon National Bank reflects a deposit to his credit on April 23, 1928, of $1,995. This sum was the balance left from a check of $12,995 drawn on the Moshannon National Bank, $11,000 of which was used to purchase a cashier's check in favor of A. M. Loch. A. M. Loch is the sister of Charles B. Maxwell. The cashier's check was deposited by Mrs. Loch in the First National Bank of Houtzdale, Pennsylvania, on May 7, 1928, and paid by the Moshannon National Bank on May 10, 1928.

Dollie Stine's account with the Moshannon National Bank shows that the checks of $38,335 and $12,995 were charged against her bank balance on April 23, 1928.

On or about May 10, 1928, Charles B. Maxwell established a trust in favor of Dollie Stine by an instrument in writing, placing in the trust securities that had a par value of $50,000.

Between April 19 and April 27, 1928, Josephine Stine received a letter at Wellesley, Massachusetts, from her uncle in Morrisdale, Pennsylvania. He enclosed in the letter a check drawn to the order of the Moshannon National Bank in the sum of $51,330.

which he requested her to sign and return to him by registered mail. Josephine Stine had never been notified by the bank of the deposit of April 19, 1928, and she did not know that she had a credit in this amount at the bank. Pursuant to her uncle's request, she signed the check and returned it to him in Morrisdale, Pennsylvania. She never saw the check again, does not know where the canceled check is, and does not know what became of the proceeds of the check.

Josephine Stine's account with the Moshannon National Bank was charged with this $51,330 check on April 27, 1928.

On or about May 10, 1928, Charles B. Maxwell established a trust in favor of Josephine Stine by an instrument in writing, placing in the trust securities having a par value of $35,000.

In a bill of complaint brought by Dollie Stine against the Moshannon National Bank and others, sworn to on September 12, 1928, she alleged that she became the owner of 1,000 shares of American Re-Insurance Co. stock on or about April 2, 1928, by gift from Charles B. Maxwell. In a like bill of complaint Josephine Stine made similar allegations.

Upon the foregoing findings of fact which we make, we must determine whether valid gifts of company stock were made to petitioners by their uncle on March 30, 1928. If valid gifts were made, the sale of the stock at a profit in April 1928 resulted in taxable income to each of the petitioners, the amount of which is not in dispute. The respondent's determination that valid gifts were made on March 30, 1928, to petitioners is *prima facie* correct, and the burden is placed on petitioners of adducing evidence to overcome the correctness of this determination.

The general rule respecting gifts *inter vivos* is stated by the Board in *Adolph Weil*, 31 B. T. A. 899, as follows:

* * * (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, *in praesenti;* (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift, or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; *Edson* v. *Lucas*, 40 Fed. (2d) 398, and authorities there cited. Cf. *Allen-West Commission Co.* v. *Grumbles* (C. C. A., 8th Cir.), 129 Fed. 287; *Edwin J. Marshall*, 19 B. T. A. 1260; affd. (C. C. A., 6th Cir.), 57 Fed. (2d) 663; certiorari denied, 282 U. S 61.

When the petitioners establish that Maxwell failed to make a valid gift due to the absence of one or more of the above quoted essential

elements, they sustain their burden of proof. The evidence adduced is concerned principally with elements (3) and (4), *supra*, namely, that Maxwell had no clear and unmistakable intention to absolutely and irrevocably divest himself of title, dominion, and control of the stock, *in praesenti*, and that there was no irrevocable transfer of the stock to the donee, so that Maxwell could exercise no further act of *dominion or control* over it.

The decisions of the Pennsylvania courts show that these two elements are requisites to any valid gift *inter vivos* in that state. *Sullivan* v. *Hess*, 241 Pa. 407; 88 Atl. 544; *Packer* v. *Clemson*, 112 Atl. 107; *In re Kaufman's Estate*, 127 Atl. 133; *In re Scanlon's Estate*, 169 Atl. 106. See also *Bauernschmidt* v. *Bauernschmidt*, 97 Md. 35; 54 Atl. 637, which quotes from *Walsh's Appeal*, 122 Pa. 177; 15 Atl. 470.

On the record here made we believe the petitioners have sustained their burden by showing that Maxwell had no clear and unmistakable intention to make the gift *in praesenti*, and by showing that he never relinquished *dominion or control* of the stock to the donees, but continuously acted as though he was the owner thereof. In the discussion that follows it must be borne in mind that a subsequent gift of the proceeds would be too late, since the profits from the sale had then been realized.

The circumstances, as they existed on March 30, 1928, convince us that Maxwell's transfer of stock was prompted by motives other than that of providing for the welfare of his nieces. Negotiations were then virtually completed for the sale of all the stock of the company to New York interests. This sale would result in a large profit to Maxwell on his holdings. He was accustomed to having Dollie Stine sign instruments and stock transfers for him whenever he requested her signature, and his banking experience could not help but bring him in contact with the income tax statute. By transferring the stock to his nieces Maxwell certainly realized that he would have the proceeds within reach because of his control over them. If motivated by these factors in making the transfers of March 30, 1928, can it be said that Maxwell was making a gift? The answer seems obvious; such an intent would be entirely *contra* to the theory of a gift. While Maxwell may have had a general intention of providing for his nieces at some future time, we can not hold upon this record that he had a clear and unmistakable intention, *in praesenti*, to give this stock to these petitioners by his transfers of March 30, 1928. We are convinced that he was actuated by a desire to reduce his taxes rather than an intention to irrevocably and finally give his nieces the stock in question. *Estate of Charles B. Maxwell, supra*. See *Liberty Service Corporation*, 28 B. T. A.

1067; affirmed in *Liberty Service Corporation* v. *Commissioner*, 77 Fed. (2d) 94; and also *Gregory* v. *Helvering*, 293 U. S. 465.

As to the second essential element, we believe that Maxwell's subsequent actions are opposed to the theory that he relinquished dominion and control over the stock or the proceeds by the transfer of March 30, 1928. After the stock was transferred to the names of these petitioners, the certificates were never in their possession. Boulton, who acted for the decedent in effecting the transfer, took the newly issued certificates and deposited them under the sale agreement. Maxwell procured the signatures of his nieces to the powers of attorney without disclosing the purpose or nature of the instruments signed. The evidence does not show that petitioners signed these instruments with knowledge that they were dealing with their own property; they were obeying their uncle, with whom they lived and who provided for them. If petitioners were stockholders they were entitled to the same notice of sale of their stock as other stockholders, yet Boulton, who sent the notices, testified that no notice was sent to the petitioners.

Immediately after the sale Maxwell set about reducing to his possession the proceeds, which had been deposited in these petitioners' bank accounts. The ease with which this was accomplished strikingly portrays the control and dominion that Maxwell exercised over the petitioners and their willingness to obey his wishes. At Maxwell's request Dollie Stine drew a check in favor of H. B. Scott, one of decedent's business associates, for the sum of $38,335. This check was endorsed by Scott to a stock syndicate used by Boulton and Maxwell to purchase stock. Also, at Maxwell's request Dollie Stine drew a check in favor of the Moshannon National Bank for $12,995. Maxwell used $11,000 of this sum to purchase a cashier's check, which was sent to his sister and cashed by her. The remaining $1,995 was deposited to decedent's credit in his personal account at the bank.

Josephine Stine was in school at the time the proceeds were deposited in her bank account. Maxwell drew a check for $51,330 in favor of the Moshannon National Bank and sent the check to her by mail for her signature. He requested Josephine Stine to sign the prepared check and return it to him by registered mail. This canceled check was never returned to Josephine Stine, nor did she receive any of the proceeds therefrom. These facts, together with the facts relative to Dollie Stine's $12,995 check, justify the inference that Maxwell acquired possession of the proceeds of this check.

As appears from our findings, Maxwell created trusts for the benefit of his nieces covering securities in the value of $50,000 and $35,000. What actually happened was that Maxwell did not get around to making his gifts until he created the trusts.

Furthermore, it may be pointed out that when Maxwell died in September 1928 he had in his possession, so far as the evidence shows, at least $16,000 of the $51,330 of the proceeds of the check signed by Josephine Stine, and $1,330 of the proceeds of the checks signed by Dollie Stine.

Maxwell's formal acts with respect to the 2,000 shares of stock resulted because his nieces were available for use as devices to avoid an increase in his tax liability. Maxwell's other actions show that he never relinquished control and dominion over the stock or the proceeds so as to make gifts of the stock to his nieces.

Since we can find no clear and unmistakable intention on the part of Maxwell to absolutely and irrevocably divest himself of the title, dominion, and control of the stock, *in praesenti*, and since we can find no irrevocable transfer *of the dominion and control* of the entire gift to the donees, so that Maxwell could exercise no further act of dominion or control over the stock, we can not find or hold that there was a valid gift from Maxwell to either of the nieces; and, on the contrary, we find and hold that no such gift was made. *Estate of Charles B. Maxwell, supra.*

In view of the conclusion here reached it is unnecessary to consider the other essential elements of a valid gift set forth in *Adolph Weil, supra. Estate of Charles B. Maxwell, supra.*

Respondent contends that the statements made under oath by the petitioners in certain proceedings which they brought against the Moshannon National Bank and others, wherein they alleged that they were the owners of the stock in question, are admissions against interest. The general rule is that allegations contained in a pleading are admissible against the party making them in proof of the facts which they admit upon any subsequent trial of the case or upon the trial of another action, but a party is not bound by admissions or averments of legal conclusions. An allegation of ownership by gift is an averment of a legal conclusion and not a statement of fact. Furthermore, when questioned about their averments on this subject, the Stines testified that the allegations were made because the stock was in their name. They further testified that the pleadings were drawn by their counsel, and presumably they followed his advice in swearing to the bill of complaint. These explanations have been considered in reaching our decision herein. See our discussion of these averments in *Estate of Charles B. Maxwell, supra.*

Reviewed by the Board.

*Decision will be entered for the petitioners.*