## Allshouse's Estate.

Argued April 13, 1931. Before FRAZER, C. J., WALL-
ING, SIMPSON, KEPHART, SCHAFFER and MAXEY, JJ.

*Asher Seip,* for appellant.

*E. J. Fox,* of *Fox & Fox,* for appellee.

OPINION BY MR. JUSTICE KEPHART, May 1, 1931:

John Allshouse, the decedent, was for many years
partner in a milling business with Levi Mann, the father
of appellant. When Levi Mann died, appellant acquired
his father's interest at a valuation of $39,000 and con-
tinued the business as Allshouse's partner. The prop-
erty consisted of a grist mill and dwelling houses, one
of which was occupied by Allshouse as his dwelling. In
1927, Allshouse, then 84 years of age, expressed a desire
to be relieved of the partnership business and to dispose
of it together with the real estate. He took the matter
up with Mann in January, 1928. The valuation was
fixed at $39,000, which was the price paid for his father's
interest. An agreement for a sale was prepared by ap-
pellant's counsel, of which the material terms are as
follows: Allshouse agreed to convey by deed all his un-
divided one-half interest in the real estate mentioned
above, but as a description of the property was at that
time unascertained it was provided that a survey by a

competent civil engineer should be made prior to the preparation and delivery of the deed, which was to be sometime in June, 1928. Allshouse also agreed to convey all his interest in the partnership business and all property in connection therewith. The agreed purchase price was $39,000, and Mann agreed to purchase all the property from Allshouse at that price. Payment was to be in this manner: a bond and mortgage should be given to Allshouse to secure the $39,000, and interest on it was to be paid Allshouse at $45 a week during his lifetime, but within thirty days after Allshouse's death this bond and mortgage should be cancelled of record by his administrator or executor without any other consideration on the part of Mann. Mann agreed to allow Allshouse to have the use and occupancy of the dwelling house in which the latter then lived together with all coal, electric light and gas used in the house by Allshouse or his family, all of which he had been receiving. Mann agreed to assume and pay all the debts of the partnership. The final clause in the agreement declared that it was the intent of the parties that the satisfaction and cancellation of record of the bond and mortgage should be without cost or expense to Mann except the cancellation fee to the recorder of deeds and that the principal secured by the mortgage should then be the property of Mann, his heirs and assigns "in like manner as if the party of the first part had either cancelled the said mortgage of record in his lifetime, or had by his last will and testament or other writings of a testamentary character given and bequeathed the same to the party of the second part."

This contract was signed May 12, 1928. Allshouse died on August 1, 1928. At that time no survey had been made. No change had taken place in the management of the real estate or the partnership business. Each partner drew the same amount a week that he had previously drawn. Mann tendered Allshouse on several occasions the sum of $45 a week as stipulated in the

agreement but Allshouse refused to accept it, saying that this should be postponed until the matter was completed. Allshouse continued to live in the same dwelling he had formerly occupied and received the same service he had theretofore been receiving. After Allshouse's death, Mann petitioned the orphans' court for a decree of specific performance of the contract with decedent; respondent, the Easton Trust Co., administrator of Allshouse's estate, defended on the grounds of a confidential relation and undue influence. The court below found the former. We shall not consider either ground, but prefer to base our conclusion on other grounds which are fatal to appellant's case.

Upon analysis of the terms of the contract, together with the circumstances following its inception and execution and leading up to Allshouse's death, they disclose no mutually enforceable contract as ever having come into being. There was no possession of the property pursuant to the terms of the writing nor was the relation of the parties any wise different from what it was before the agreement was made. The parties dealt and acted as though the agreement did not exist, and, in law, it did not, for these reasons: No deed for the property ever passed between the parties, though expressly required by the agreement. It was to be drawn from a survey which was never made. The agreement called for a mortgage, but it is obvious that a mortgage could not have been given. The stipulated weekly sum of $45 was payable as interest on the mortgage. It was never paid to deceased and since no mortgage ever existed there is now no claim for this amount. It does not appear that there were any partnership debts left unpaid. The time stipulated in the agreement for giving a deed had expired. The trial court found that Allshouse "refused to accept the same, saying that matter should be postponed until......it......was ended." It is clear the contract continued in an inchoate or, as stated in some cases, executory form, since without consideration

or mutual obligation it could not be enforced. Much was to be done before it could be completed and hence legally effective. The parties themselves did not seem to consider the contract effective until "the matter was ended," that is, by delivery of the deed and mortgage.

The written document was an undertaking to make a gift to Mann and that this was Allshouse's intention plainly appears from the terms of the agreement. It was unexecuted when the donor died. The weekly payment of $45, though called interest payments in the agreement, was merely compensation for the use of the property itself, and was not the consideration for the property, since both parties believed it to be worth $39,000. The weekly payments may be likened to a gift of bonds where the income from them is retained until death. See Packer v. Clemson, 269 Pa. 1; Funston v. Twining, 202 Pa. 88. That a contract with mutually extensive obligations was intended is negatived by the outstanding fact that no consideration passed or was in fact to pass from Mann to Allshouse. All the considerations in the writing were benefits which Allshouse was then receiving, and on the valuation fixed the weekly payments were merely compensation for the use of the property which did not differ from the then existing arrangement. The bond and mortgage mentioned as the consideration were none in fact, as they were to be cancelled at Allshouse's death without cost to Mann. The transaction, if it had been carried through, under the terms of the agreement, would have been valid, but in reality it would have amounted to no more than a gift by one partner of his interest to the other.

The question presented to us, therefore, is whether equity will specifically enforce an unexecuted gift or give legal effect to the document before us. If the requisites of a valid gift were present, complete in all its essentials, then equity might assist in preventing the gift from being nugatory. If, however, the essentials of the gift are not made out, in the full legal sig-

nificance of the term, no relief will be granted. An executory or imperfect gift, where the circumstances are insufficient to justify the inference of a trust, will not be enforced either at law or in equity, nor will equity presume to erect an imperfect gift into an enforceable trust merely because of the imperfection: Smith's Est., 144 Pa. 428; Ashman's Est., 223 Pa. 543; 28 Corpus Juris, page 668.

With respect to personal property the requisites of a valid and irrevocable gift have long been settled in this State and have been laid down in any number of cases. As said in Packer v. Clemson, supra, 269 Pa. 1, 3: "To make a valid gift inter vivos there must be a clear, satisfactory and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery, actual or constructive." These principles have been affirmed in numerous cases, among which are: Kaufmann's Est., 281 Pa. 519; Connell's Est., 282 Pa. 555; Leadenham's Est., 289 Pa. 216; Yeager's Est., 273 Pa. 359. As said in Walsh's App., 122 Pa. 177, 187, "If there remains something for the donor to do before the title of the donee is complete, the donor may decline the further performance and resume his own," and again, at page 190, "it is not possible that a chancellor would compel an executor or administrator to complete a gift by the doing of any act which the alleged donor if living might have refused to do, and thereby revoked his purpose to give." In In re Campbell's Est., 7 Pa. 100, Chief Justice GIBSON stated: "A gift is a contract executed; and, as the act of execution is delivery of possession, it is of the essence of the title. It is the consummation of the contract which, without it, would be no more than a contract to give, and without efficacy for the want of consideration." Again, as we stated in Clapper v. Frederick, 199 Pa. 609, 613, "Without a complete delivery during the lifetime of the donor there can be no valid gift inter vivos. 'Though

488

every other step be taken that is essential to the validity of the gift, if there is no delivery, the gift must fail. Intention cannot supply it; words cannot supply it; actions cannot supply it; it is an indispensable requisite, without which the gift fails, regardless of consequence': Thornton on Gifts, etc., page 105." The consequence is that no matter how often or how emphatically the desire or intention of the donor to make the gift has been expressed, upon his death before delivery has been completed, the promise or purpose to give is revoked: Scott v. Lauman, 104 Pa. 593; 28 Corpus Juris, page 651.

Where the gift is of real property the same rules apply: There must be an unmistakable intention to part with and surrender complete dominion over the premises, accompanied by an intention to invest the donee with the right of disposition, followed by an irrevocable delivery, before the gift will be considered complete and legally effective. Since it is impossible to make manual delivery of real estate, it is dispensed with and in its place a deed of conveyance must be delivered to the grantee. If there is no such delivery of a deed, then the gift is incomplete: Tozer v. Jackson, 164 Pa. 373; Duraind's App., 116 Pa. 93. An exception to this rule is that of a parol gift of real property, to which the statute of frauds is held to be no bar to enforcement if the donee has taken possession of the land and made improvements on it. See Sower's Admr. v. Weaver, 84 Pa. 262; Greenwich Coal & Coke Co. v. Learn, 234 Pa. 180; Rader v. Keiper, 285 Pa. 579; Glass v. Tremellen, 294 Pa. 436. Here the donee did not take possession or improve the premises, so as to entitle him to equitable relief. The facts here are substantially similar to the written agreement to make a gift in Smith's App., 237 Pa. 115, where it was said of the paper there in question: "Interpreted by its own terms it is but an expression of a purpose to make a gift in the future." The contract between the parties, if it had been executed, would have resulted in a gift by Allshouse to Mann.

But the contract was never executed, for the effective act was to be a deed from Allshouse to Mann; the donor died before executing the deed and before any of the covenants in the agreement of gift were performed. The agreement, which contemplated that other things should be done before title should pass, could not operate as a conveyance in itself. When a person in his lifetime agrees to make a gift of land by delivery of a deed and dies before the deed is delivered, the gift is unexecuted and the purpose or intention to make a gift is revoked by death.

Judgment affirmed.