MARY ELIZABETH GARDELLA AS THE EXECUTRIX OF THE ESTATE OF JOHN QUESTA, ALSO KNOWN AS JOHN A. QUESTA, JOHN ADAM QUESTA, AND J. A. QUESTA, DECEASED, APPELLANT, *v.* JAMES SANTINI, EXECUTOR OF THE ESTATE OF RAEPHEL GAMINARA, ALSO KNOWN AS RAF-FAELE GAMINARA, DECEASED, RESPONDENT.

No. 3508

May 12, 1948.                    193 P.2d 702.

*William S. Boyle,* of Reno, for Appellant.

*R. S. Flanary,* of Sparks, for Respondent.

**OPINION**

By the Court, HORSEY, J.:

On August 9, 1947, James Santini, as executor of the estate of Raephel Gaminara, also known as Raffaele Gaminara, deceased, caused to be filed, in Department 2 of the Second judicial district court of the State of Nevada, in and for the County of Washoe, a petition alleging, in substance, petitioner's appointment and qualification as executor, his demand upon John Questa to deliver to him all money and property belonging to the estate, and that the said Questa refused and neglected to do so, claiming that the property of the estate (sic) was given him by the decedent.

On August 26, 1947, John Questa answered such petition, denying that he had any money in his possession belonging to the estate, and alleging affirmatively "that the decedent delivered all his money to John Questa as a gift for him to keep and divide with his sister" (Mary Gardella) "with the further instructions that John Questa pay all his hospital and doctor bills, and funeral bills in the event of sickness and death," and alleging further, "that in pursuance to said gift and instructions, Mr. Questa did place the decedent in a hospital and pay all bills, and hire the best obtainable medical care and doctors, and the remaining money he has kept to be divided between himself and sister, and to pay any other bills owing by decedent."

On August 9, 1947, pursuant to said petition, a citation was issued, citing and requiring John Questa to appear before the judge of said court, on August 11, 1947, to show cause, if any, why he should not surrender to James Santini, as such executor, any money or property of the decedent in his, Questa's possession or under his control, and to answer under oath concerning same.

The said Questa, with his attorney, William S. Boyle, Esq., duly appeared, pursuant to such citation, on said 11th day of August, 1947, before said court; also the petitioner, James Santini, and his attorney, R. S. Flanary, Esq., were then and there present. Good cause appearing, it was ordered by the court that the hearing be continued until August 26, 1947, at 10: 30 A. M.

The hearing was had on August 26 and 27, 1947. James Santini, Eleanor Mortenson and Catherine Fino testified on behalf of petitioner. John Questa was called by petitioner as an adverse witness, and testified as such, and was thereafter called and testified on his own behalf; also Mary Gardella and Dr. Antonio Miniggio were called as witnesses by petitioner, and testified. After hearing the arguments of respective counsel, the court, the Hon. A. J. Maestretti, district judge presiding, made the following order:

"The court directs John A. Questa, designated in the petition, to deliver to the executor the residue of the unexpended money, between $11,783.50 and $17,365.00 whatever the sum may be, to be held by the executor to be disposed of in accordance with the disposition of the estate."

The record does not disclose that the honorable District Judge stated any reasons for the order. The order not having been complied with, the court, on the 10th day of September 1947, made a further order, reciting the failure of John Questa "to comply with the order * * * made on August 27, 1947, and to pay to James Santini, the Executor of the above entitled estate the sum of $5,601.50, which the said John Questa has in

cash in his possession," and ordering "that you, John Questa, do forthwith pay to E. H. Beemer, Clerk of the Second Judicial District Court of the State of Nevada, the sum of $5,601.50 which has been adjudged to be the property of the estate of Raephel Gaminara, deceased." It was further ordered, "that the said E. H. Beemer, retain said sum in his hands, pending the due prosecution of any appeal herein from the order of this Court heretofore made on August 27, 1947."

From the said above described order made August 27, 1947, and from an order dated September 8, 1947, denying John Questa's motion for a new trial, and from the said above-described order made September 10, 1947, the said John Questa has appealed to this court.

Because of the fact that the record on appeal failed to disclose any reason or findings or conclusions, either factual or as to matters of law, by which this court could determine the legal basis or bases for said above-mentioned orders, this court, on April 2, 1948, respective counsel having stipulated their approval, requested the Hon. A. J. Maestretti, said district judge, to furnish to this court and respective counsel a memorandum or statement in clarification of his decision and said orders based thereon, and particularly requested him to answer the following questions:

"1. What essential facts involved in such proceeding did the District Court find to have been sufficiently proved by the evidence?

"2. In particular, did the District Court find that the testimony of John Questa and Mary Gardella, respectively, in relation to a gift of certain money to said Questa and his sister, Mary Gardella, coupled with a trust to defray the expenses of the last illness, hospitalization, etc. and the funeral expenses of Raephel Gaminara, also known as Raffaele Gaminara, was true or untrue, or partly true and partly untrue? If the Court found such testimony to be partly true and partly untrue, please indicate to what extent the District Judge

believed such testimony, and to what extent he disbelieved same.

"3. If the District Judge did believe the testimony of John Questa and Mary Gardella to the effect that a gift was made to them of such money, please indicate upon what legal conception or theory did the District Court reach the conclusion that the $5,601.50 involved should be ordered turned over by John Questa to James Santini, executor of the Gaminara Estate."[1]

Pursuant to such request and in compliance therewith, Judge Maestretti, on April 16, 1948, submitted the following memorandum or statement:

"Now comes A. J. Maestretti, District Judge of Department 2 of the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, who presided at the hearing of the matter now before the Supreme Court, and pursuant to the request of the said Supreme Court, the said District Judge submits herewith the requested memorandum or statement referred to in the order of April 2, 1948, as follows:

"Answering the suggested particulars by the number and in the order in which they are contained in said order: 1. The Court found from the evidence of the various witnesses, to the satisfaction of the Court, that the money involved in the proceeding was the property of the deceased and that it was held in trust by John Questa for the benefit of the deceased.

"2. The Court finds that the testimony of John Questa and Mary Gardella was insufficient under the law to

---

[1]Judge Maestretti, during such proceedings, indicated the impropriety of attempting to try or determine title to property in such a proceeding in the absence of formal pleadings and issues, but finally did proceed to the extent that he made the orders above mentioned and described. When the proceeding came to us on appeal, therefore, the record, of course, did not contain any such pleadings or disclosure of issues. In the absence of same and in view of the failure of Judge Maestretti to state any reasons for his decision and said orders resulting therefrom it became impractical for us to proceed with the preparation of this opinion without requesting further information and clarification.

create the transaction into a gift. See answer of John Questa on page 18, line 19 of the transcript in which Questa replied to the question put to him, 'Why didn't you put that amount of money in the bank, Mr. Questa?' 'Because the man didn't trust the banks.' The Court feels that if the deceased had made a gift of the money to Questa and Gardella, that it wouldn't have made any difference to him what was done with the money, and the question of his trust in the banks could not possibly bind Questa or Gardella.

"The Court found that Gaminara gave the money to Questa and Gardella for the purpose of safety as disclosed in the testimony of Gardella when she testified that Gaminara brought the money to the house and expressed distrust of the banks; and the very language of her testimony indicates to the Court that he did not give it to them as a gift but that he asked them to keep it and help bury it in the basement on account of his lack of trust in the bank. See the testimony of Gardella beginning at line 3, page 67, in which is disclosed the lack of trust in the banks by Gaminara, and the further fact that beginning at line 20 she states that he counted it out on the dining room table, and the question arises in the mind of the Court what reason Gaminara would have for counting it out if he was making a gift to Questa and Gardella. This question remains unanswered, and further, continuing in the same answer, she said that Gaminara and John went in the basement and buried it in the basement.

"3. The Court did not believe that Gaminara ever made a gift of the money to Questa and Gardella; if he did, he would not have made the order directing Questa to surrender the money to the Executor.

"Respectfully submitted in compliance with the order heretofore made on April 2, 1948."

We confess it is difficult for us, even in the light of Judge Maestretti's memorandum or statement, to determine with certainty whether the learned judge

disbelieved the testimony of John Questa and Mary Gardella, or whether he believed such testimony but for legal reasons considered same insufficient under the law to establish or create a gift.

■ Both the answers to our questions 2 and 3 would indicate the latter, and, as a matter of fairness to appellant, we believe that, in the absence of any statement on the part of Judge Maestretti that he did not believe said testimony, we should assume that he did believe it, but did not believe the delivery sufficient, or did not believe that a gift inter vivos, which must be absolute and irrevocable to be valid, could coexist with a trust created in the same transaction, or did not believe that, in view of a trust requiring until or beyond the death of the deceased for its complete fulfillment, and, until then, the subject matter of the gift being contingent and in an amount unascertained, that there could be any vesting of the donated property until death, and that then the question of testamentary disposition would defeat it, and that hence, for some or all of these legal reasons, the Judge considered the evidence insufficient to establish the essential legal basis for a gift. Judge Maestretti's answers and comments will be further considered and discussed herein after we have presented essential portions of the testimony and treated certain questions of law which are more or less involved or may be deemed to be material.

What are the essential facts as established by the evidence? It is not controverted that the deceased, Gaminara, who was about 81 years of age when he died, and John Questa and Questa's sister, Mary Gardella, had been close friends for many years; in fact, Questa's testimony that Gaminara worked for his, Questa's father when John was one year old was not disputed. Neither was there any question raised which would tend to depreciate the extent of the friendship existing between Gaminara, on the one hand, and Questa and Mrs. Gardella, on the other.

On one occasion, about forty years ago, Gaminara had an operation on his leg, had a broken blood vessel, was in St. Mary's hospital in San Francisco for a month, then Mrs. Gardella and her husband took care of him for four years, before he could work. Thereafter he worked at ranches in California in the summertime, and was with the Gardellas part of the time in the winter months. Gaminara had saved some money, and after Mrs. Gardella's husband died and Gaminara was living in a cabin on Bell Street, in Reno, Mrs. Gardella suggested he not live longer in a cold cabin, but invest his money in a house. He did this, and Mrs. Gardella helped him plan the house, which he built by his own labor. She took care of the paving, the sidewalk, curbing, etc., and paid all the bills for him, including those for water, taxes, and insurance. The testimony of Questa disclosed that he, too, did many things for Gaminara. After building the house, however, Gaminara did not live in it, but continued to live in the cabin on Bell Street.

In 1931 Gaminara had $12,000 in one of the Reno banks, and, while he was digging a trench for the water company, heard the bank was going to fail, and, according to the testimony of Mrs. Gardella, also Questa, Gaminara withdrew his deposit of $12,000 from the bank and brought it to the home of Questa and Mrs. Gardella, and said, according to Mrs. Gardella's testimony (Tr. 67):

" 'I trust you better than a bank,' and he gave it to me and John * * *. He said, 'Well, I am not very well,' because he always had a pain around his heart. He said: 'Well, if anything happens to me, I know you and John will take good care of me, and whatever is left it is a gift to you and John, and I know you will do the right thing by me.' "

It clearly appears, however, from the testimony of Questa, that Gaminara's words concerning making the

gift of the money to Questa and his sister, Mrs. Gardella, were spoken in or about February 1944, about thirteen years after the occasion upon which he brought the $12,000 and turned it over to them. There is nothing in the evidence to show, except, perhaps, an inference from Mrs. Gardella's testimony above quoted, nor any claim by appellant of, a gift in 1931, or that Questa and Mrs. Gardella during such period of thirteen years (1931–1944) held the $12,000 otherwise than merely for safekeeping, or that they had any interest in it other than as mere bailees for Gaminara. The respondent's attorney, Mr. Flanary, also has subscribed to such interpretation of the testimony. On pages 4 and 5 of respondent's answering brief it is stated:

"The only testimony on this point is that of Questa and his sister; both of whom claim the alleged gift jointly. The evidence is that just before the Nevada Banks closed in 1931 Gaminara drew his money from the bank where it was on deposit and brought it to the Questa home for safekeeping. At this time he had Twelve Thousand ($12,000.00) Dollars. Later, some three years before his death, he brought Four Thousand ($4,000.00) Dollars more to put with it; the money was counted; then Gaminara and Questa went to the wine cellar, Gaminara pointed out the place where it was to be buried, behind the cellar door, the money was buried there; neither Questa or Gaminara ever dug it up, or in any way used it, until after Gaminara was in St. Mary's Hospital in Reno; and then part of it was used to pay decedent's hospitalization expenses. The remainder, amounting to Five Thousand Six Hundred One Dollar and Fifty Cents ($5,601.50) is now claimed by Questa and his sister as a gift. They testify, in substance, that the decedent, at the time the Sixteen Thousand ($16,000.00) Dollars was buried, 'gave' the money to them, that out of it they should pay for his last illness and his funeral, and that they could have the rest."

Neither Mrs. Gardella, in her testimony, nor Judge

Maestretti, in his memorandum and statement, appear to conceive any separation as to time in relation, particularly, to statements accompanying the turning over of the $12,000 and, thirteen years later, the $4,000, or the significance of such difference in time in the happenings on each of these separate occasions, in determining whether or not a valid gift from Gaminara to Questa and Mrs. Gardella was made.

These two events or occasions, thirteen years apart, and what occurred upon each of them, appear more clearly from the testimony of John Questa than elsewhere. John Questa testified, in part, as follows:

"The Witness. I had Twelve Thousand Dollars of his money.

"Mr. Flanary. Q. When he came down to live with you some three years ago? A. No, just wait a minute.

"Q. I want to know when you came into this Twelve Thousand? A. For years he let me have it. I was holding it.

"Q. You received it more than three yeas ago? A. This Twelve Thousand Dollars Yes. And after he sold his house, he says, 'I sold my house,' because he used to live in a cabin in the back of this house, and he used to have fainting spells, and he found himself fainted on the floor two different times, so he told me, 'And the reason I sold my house, I want to move down with you folks and live with you until I die. You have always been nice to me. You are the only people I ever trusted here in Reno,' And he brought down the other Four Thousand Dollars, (for?) which he sold the house, and then I went and got the Twelve Thousand Dollars, and laid it there on the table, and he added the other Four Thousand Dollars with it, and there he said, 'I'm making you a gift, to you and your sister, of this money.'

"Mr. Flanary. Q. Then I am to understand you had Sixteen Thousand Dollars of Mr. Gaminara's money about three years ago, is that right? A. Yes, and when he gave us this money—made a gift to us—he says,

'Now you people will take care of me.' * * * He said, 'Here is this money. I am going to give it to you as a gift.' He says, 'I know I can trust you people, that I can depend on you, that if I get sick I will be taken properly care of, and if I die, I know you will give me a decent burial, and if there is any money left out of this gift, divide it up between yourself and your sister.'

"Mr. Flanary. Q. What was done with the money after that? A. I kept it in my possession.

"Q. And where? A. In the basement, my cellar.

"Q. Why didn't you put that amount of money in the bank, Mr. Questa? A. Because the man didn't trust the banks.

"Q. Was he still controlling the Sixteen Thousand and what you did with it at that time? A. He had given it to me. When a person gives you a gift, they have no more control over it.

"Q. Do you have any faith in banks, Mr. Questa, yourself? A. I don't know very much about them.

"Q. Where was the money placed? Was it buried? A. Buried in a can.

"Q. Where was it buried? A. In my cellar.

"Q. What location? A. By the door there when you enter the cellar, to the right.

"Q. So then you did keep the money there from the time it was given to you by Mr. Gaminara until he passed away or not? Did you keep it in the same place all the time? A. In the same place until he was taken to the hospital.

"Q. That was in September, '46? A. Now wait a minute. Two or three or four days later, after he was up in the hospital, he told me, 'Go down in my cabin and you look in a drawer down there. You will find some money there in a can.' All right. I went down and looked where he told me, and there was Thirteen Hundred Dollars there, and Fifty-five Dollars in a purse, I found, and Ten Dollars in silver in a drawer, and then he asked me if I had found it, and I told him yes, and he

said, 'You use it to pay the expenses up here.' And I start using it.

"Q. You did pay his expenses at the hospital from time to time? A. I did pay, but that didn't go very far. I soon started spending some of that gift he had given us, because I think the man was entitled to good treatment for being a long life friend.

"Q. Now after the Sixteen Thousand was placed by you in the cellar, did Mr. Gaminara go in there and get any of the gift at any time? A. No.

"Q. And you say you then started to use the Sixteen Thousand to pay his hospital and medical expenses? A. Yes.

"Q. Can you tell me approximately how much you spent in hospital and medical expenses from the time he was sick in September, 1946, to the time he died? A. Approximately between Twelve and Thirteen Thousand Dollars. There is one bill outstanding yet."

■ Upon the occasion when Gaminara brought the $4,000 to Questa's house, and Questa brought out the $12,000, he had been keeping for Gaminara for thirteen years, and placed it on the table, and Gaminara placed the $4,000 with it and said (according to Questa's testimony), "Here is this money. I am going to give it to you as a gift," and then proceeded to state the language expressing trust and confidence, the purposes for which the money was to be used (as above quoted from the testimony), and, finally, what was to be done with the remainder of the money, if any remained, was a trust created? We think that there was. The words used were more than mere precatory words of recommendation, requests or hope; they were strong expressions of confidence and trust, used because of the importance to Gaminara of the objectives outlined, namely, proper care if he became ill, and a decent burial if he should die, and the need of trustworthy persons to accomplish these objectives, and the assurance that they whom he had selected possessed those qualities. It does not appear

reasonable to believe that Gaminara was willing that these objectives, so vitally important to him and for which he had the money to pay, should be left merely in the category of moral obligation. That he did not so intend, but intended to impose upon Questa and Mrs. Gardella a trust obligation, is made abundantly clear by Gaminara's language (as testified to by Questa), "and if there is any money left out of this gift, divide it between yourself and your sister." This plainly implied that Questa and his sister were not to use any money of their gift until all expenses of Gaminara's proper care, if he became ill, and of his funeral, if he died during the lifetime of Questa and his sister, had first been paid from the trust fund.

■ Regardless of the time of the vesting of the title to the money which was the subject matter of the gift, the beneficial enjoyment of same by the donees, Questa and Mrs. Gardella, was postponed until all such expenses had first been paid, including the expenses of a decent burial. The context of the words bestowing the gift thus clearly imposed the trust, by the very limitation of the right to the beneficial enjoyment which the last clause (as above quoted) expresses.

Many authorities pertaining to the subject of precatory trusts, in its various phases, are collected in numerous A.L.R. annotations, among which we cite the following: 49 A.L.R. pp. 10–103; 70 A.L.R. pp. 326–334; 107 A.L.R. pp. 896–924. See, also, annotation in 23 A.L.R. pp. 1500–1550, on subject, "Degree or Intensity of Parol Proof Necessary to Establish a Trust."

We believe it is clearly established that Gaminara intended to establish a trust obligation coupled with the gift of the $16,000 to Questa and Mrs. Gardella, and they accepted such gift subject to such obligation.

The honorable district judge so concluded. He so expressed himself on page 1 of his said memorandum or statement, as follows:

"The Court found from the evidence of the various

witnesses, to the satisfaction of the Court, that the money involved in the proceeding was the property of the deceased and that *it was held in trust* by John Questa for the benefit of the deceased." (Emphasis added.)

But, as has hereinabove been stated, Judge Maestretti also found "that the testimony of John Questa and Mary Gardella was insufficient under the law to create the transaction into a gift," and, in order to demonstrate its insufficiency and inconsistency (as he conceived them to be), the learned jurist quoted the question put to Questa by Mr. Flanary, "Why didn't you put that amount of money in the bank, Mr. Questa?" and Questa's answer, "Because the man didn't trust the banks." Then Judge Maestretti commented as follows:

"The Court feels that if the deceased had made a gift of the money to Questa and Gardella, that it wouldn't have made any difference to him what was done with the money, and the question of his trust in the banks could not possibly bind Questa or Gardella."

It is apparent from the foregoing that Judge Maestretti, even though he found the existence of a trust in favor of Gaminara, which was ample reason why Gaminara's views as to not trusting the banks and his wishes that the money be not deposited in a bank should be respected, also was of the opinion that the effect of the existence of the trust was to preclude entirely the existence of a gift. This view of the learned judge is further manifested by his statement on page 2 of his memorandum or statement, as follows:

"See the testimony of Gardella beginning at line 3, page 67, in which is disclosed the lack of trust in the banks by Gaminara, and the further fact that beginning at line 20 she states that he counted it out on the dining room table, and the question arises in the mind of the Court what reason Gaminara would have for counting it out if he was making a gift to Questa and Gardella. This question remains unanswered, and further, continuing in the same answer, she said that Gaminara and

John went in the basement and buried it in the basement."

And in the sentence immediately preceding that above quoted, Judge Maestretti stated: "and the very language of her testimony indicates to the Court that he did not give it to them as a gift but that he asked them to keep it and help bury it in the basement on account of his lack of trust in the bank."

■ It seems to us readily apparent that the expressions of Judge Maestretti indicating that Questa and Mrs. Gardella were entrusted with the money merely for safekeeping, as they had been for thirteen years with the $12,000, and that Gaminara did not give up control of and dominion over the money, are inconsistent, not only with the learned judge's finding that there was a *trust* as to such money for the benefit of Gaminara, but also inconsistent with the declaration of Gaminara at the time, as above fully set forth, which clearly disclosed his intention to place the management and control of the funds in the hands of Questa and Mrs. Gardella. He was ill, and for that reason came to live with them, fearing a recurrence of his fainting spells. He undoubtedly wished to relieve himself of the responsibility, particularly, of arranging for his care and meeting the expenses thereof should he become more seriously ill, and of arranging for his funeral and the expenses of same should he die. To create a valid trust (and Judge Maestretti found a trust was created), it was essential that Gaminara transfer or deliver over all control of and dominion over the money, and that he divest himself of both the legal and equitable title thereto. In 54 Am. Jur. sec. 34, p. 45, this essential prerequisite is stated as follows:

"It is essential to the creation of an express trust that the settlor presently and unequivocally make a disposition of property by which he divests himself of the full legal and equitable ownership thereof.

■■ In order to dispose of personal property by gift,

or in trust, or by gift coupled with a trust, there must, of course, be delivery, either actual or constructive. In the instant case it is clear that Gaminara, being desirous of creating a trust, intended to do all things essential to its creation. He went with Questa to the wine cellar or basement of Questa's house, and selected the spot for the burial of the money, and, together, they buried it. Gaminara knew he was placing the money in the cellar of a property he was not occupying and in which he had no interest, but which was not only owned by Questa and Mrs. Gardella, but was also under their exclusive dominion and control. The key thereto was theirs, and was kept in the chiffonier in their living room, and no one had the right to use it but Questa and Mrs. Gardella. There is no evidence that Gaminara ever requested a key. The fact that Questa testified he would have given Gaminara some of the money had he requested it is beside the point. Naturally he would have done that, under the circumstances. But Questa also testified: "he had given it to me. When a person gives you a gift they lose control over it."

We feel constrained to hold, therefore, that there was adequate delivery to Questa and Mrs. Gardella of the $16,000, and that, contemporaneously, a trust was completely and validly created.

Reverting to Judge Maestretti's reference to the testimony of Questa that "the man did not trust the banks," given in response to the question as to why he did not deposit the money in a bank, and to the Judge's reference to counting the money, as an indication that Questa and Mrs. Gardella did not receive the money as a gift, it is apparent that the learned judge believed that this recognition or admission by Questa of Gaminara's continuing interest in the money was so inconsistent with the proper legal conception of a gift that, in view of such testimony, any such claim of a gift became entirely untenable; that the unconditional, unequivocal and absolute character of a gift inter vivos

could not be reconciled with the requirements of a trust, the terms of which would necessarily postpone, at least, the benecial enjoyment of the gift. To state such apparent conception in perhaps more simple language, Judge Maestretti apparently believed that there could, legally, be no such thing as a gift coupled with a trust. The judge apparently believed that in order to constitute a gift, Questa and Mrs. Gardella must be given the money absolutely and unencumbered with a trust; that if a trust were created, the entire equitable title must be deemed retained by Gaminara, and the legal title held in trust entirely for his benefit and the benefit of his estate. The authorities, however, do not sustain the learned judge's conception in that respect.[2]

It is possible, also, that Judge Maestretti, in view of the uncertainty of the extent of future illnesses of Gaminara and the amounts which the trust provisions might require for their fulfillment, deemed any remainder which Questa and Mrs. Gardella might be entitled to enjoy under the gift so contingent and uncertain that same, not being ascertainable with certainty until after the death of Gaminara, could not vest immediately and could not be permitted to vest upon death occurring, or thereafter upon the payment of funeral expenses having been completed, for the reason that to permit the latter would be to allow the disposal of property after death without the required testamentary disposition. This latter conception was contended for by the respondent.

■ Fortunately, we have found authorities which

[2] It is clear that if a gift which could be upheld occurred upon the occasion when Gaminara brought the $4,000 and placed it with the $12,000, on the table, in the presence of Questa and Mrs. Gardella, it was a gift inter vivos, and not a gift causa mortis. The principal elements of a gift causa mortis are entirely absent. The donor was not, at the time of the gift, in extremis, the gift was not conditioned upon the occurrence of the donor's death to become completely effective, but, because of the nature of the express provisions, immediate and completed effectiveness was indicated. The gift, unlike a gift causa mortis, was irrevocable. For a statement of the distinguishing features between such different kinds of gifts, see 38 C.J.S., Gifts, sec. 4, pages 782, 783.

make clear, we believe, that a trust such as was created in the instant case may be coupled with a gift inter vivos, without impairing the absolute, unconditional characteristics of such a gift, and without interfering with the immediate vesting in the donee of both the legal and equitable title to the property which is the subject matter of the gift.

The case of Reynolds v. Maust, 142 Pa.Super. 109, 15 A.2d 853, 854, is directly in point. On July 1, 1929, Mrs. Reynolds said to her son, "what you have in your hands belongs to you" and that after she was gone he was to pay her funeral expenses. Since April 18, 1929, he had had possession of the bonds, and was holding them in trust for his mother. He then prepared a writing, which Mrs. Reynolds signed with her mark, and delivered to him, same being as follows:
"7–1–29

"Walker you sell the two bonds I gave you, pay my funeral expense after I am gone, and the balance remaining belongs to you.

"Lida scolds at me often and has taken my bank book and papers.

her<br>
X   Mrs. O. F. Reynolds<br>
mk

"Witnesses:

"W. J. Reynolds

"Myra Reynolds"

The son, Walker, died about one month after the death of his mother, who passed away September 23, 1936, intestate, and, therefore, said son had failed to pay the funeral expenses. The suit was in equity, by the administrator of the mother's estate against the executrices of the last will and testament of the son, wherein the plaintiff demanded a return of the bonds or an accounting of the proceeds and income received therefrom. The following is quoted from page 854 of 15 A.2d from the opinion by Balridge, J.:

"The chancellor also found that the son did not occupy

any position of supervision over his mother's affairs; that the gift made seven years prior to her death was her free and intelligent act, unaffected by undue influence or fraud of any kind; and that the donee successfully carried the burden of showing a valid gift inter vivos. The bill was accordingly dismissed. This appeal followed.

"The appellant contends that the trust agreement of April 18 retained by the mother was not superseded by the writing of July 1; that it was not to take effect until after her death, and, therefore, it was testamentary in character; that at most the alleged gift was subject to a condition which was never performed in the lifetime of her son. A will is the legal declaration of one's intentions which are to be performed after his or her death. In re Stinson's Estate, 228 Pa. 475, 477, 77 A. 807, 30 L.R.A.,N.S., 1173, 139 Am.St.Rep. 1014.; In re Gibson's Estate, 128 Pa. Super. 44, 48, 193 A. 302. If this writing was not to take effect until after the donor's death, the appellant's contention is sound. On the other hand, if the paper passed the absolute ownership of bonds immediately to the son, as the chancellor found, although possession had been previously transferred to him on April 18, it was not a will but a gift inter vivos.

" 'To make a valid gift inter vivos there must be a clear, satisfactory, and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift, with an intention to invest the donee with the right of disposition beyond recall, accompanied by an irrevocable delivery, actual or constructive.' In re Allshouse's Estate, 304 Pa. 481, 156 A. 69, 96 A.L.R. 379.

"The writing of July 1, 1929, does not expressly direct nor does it even indicate that Walker was to wait until the donor's death to dispose of the bonds. He could have done that forthwith. * * *

"We are in accord with the view taken by the chancel-

lor that the writing of July 1, 1929, was for the purpose of carrying out the intention of the mother to make a present unconditional gift to her son, thereby to divest herself of all dominion over the bonds and invest in him complete control over them. Not only the writing, but the oral testimony, which indicates that the mother felt Walker did not receive a fair share of his father's estate, supports the conclusion that it was the intent of the donor to make an absolute gift unconditional as to delivery and the vesting of title, imposing a trust or an obligation upon the part of the donee to pay the donor's funeral expenses. While the son, owing to his death shortly after that of his mother, did not pay the funeral expenses, they were paid by his executrices.''

The Pennsylvania court thereupon quoted from Corpus Juris and from the New York case of Podmore v. South Brooklyn Savings Inst., respectively, as follows:

" 'A stipulation that the donee shall pay the donor's debts or funeral expenses out of the property given does not render the gift invalid.' 28 C.J. 697, § 117 [38 C.J.S., Gifts, § 93]. It is stated in Podmore v. South Brooklyn Savings Inst., 48 App.Div. 218, 62 N.Y.S. 961, 963, as follows: 'It has been repeatedly held, both in England and in this country, that words of similar import to those here used, "Take these books, and bury me out of them, and what is left is yours," do not limit or place a condition upon the gift. They simply impose upon the donee a trust duty to pay the expenses of the donor's funeral. Hills v. Hills, 8 Mees & W. 401; Bouts v. Ellis, 17 Beav. 121; Blount v. Burrow, 4 Brown, Ch. 72; Clough v. Clough, 117 Mass. 83; Pierce v. (Boston Five Cents Sav.) Bank, 129 Mass. 425 (37 Am.Rep. 371); Curtis v. (Portland Sav.) Bank, 77 Me. 151 (52 Am.Rep. 750).' "

We note that the New York court, in the foregoing opinion, cited English authorities, as well as those from Maine and Massachusetts, and Mr. Justice Barrett, who

wrote the opinion, emphasized the general acceptance of the doctrine, by his words [48 App.Div. 218, 62 N.Y.S. 963], "it has been repeatedly held * * *."

■ It seems clear to us that the holding of the Pennsylvania court in Reynolds v. Maust, supra, and of the English and American authorities above mentioned and cited in said New York case of Podmore v. South Brooklyn Savings Inst., supra, clearly indicate that the weight of authority establishes that a gift inter vivos, coupled with a trust requiring the donee to pay for the donor's care and support, expenses of illness, or illnesses, and funeral expenses, and whatever is left, if anything, to go to the donee beneficially, is entirely valid. Such a gift is not by such a trust provision rendered conditional, nor the vesting of the donees' property postponed. This situation reminds the writer of this opinion of the transfer of property encumbered by a mortgage. Under the modern conception of a mortgage, that same is, in equity, a lien, and not a transfer of title to the mortgagee, the owner of the mortgaged property may, without doubt, convey, as a gift inter vivos, the mortgaged premises, at least in the absence of a covenant against alienation, and both the legal and equitable title would vest, in praesenti, unconditionally and irrevocably in the grantee or donee, subject to the mortgage lien, even though foreclosure may become necessary, and the process of satisfying the encumbrance might result in depriving, or divesting, the donee of the entire title to the property.

The authorities very generally, in dealing with the question of the validity of gifts inter vivos subject to trust provisions of varying kinds in favor of the donor, uphold such gifts and such accompanying trust provisions if the intent is to make an absolute, unconditional gift in praesenti, even though the beneficial enjoyment of the gift is postponed until the death of the donor in order that the donor may continue to enjoy certain benefits, such as interest, dividends or other income

retained by him by virtue of such trust provisions. And this kind of gift coupled with such a trust is upheld upon the theory that the title, both legal and equitable, vests immediately, absolutely and irrevocably in the donee, irrespective of such trust obligation. The donor is held thereby to have fully disposed of the property in his lifetime, and same is not, by such trust provisions, made subject to testamentary disposition, even though such provisions may ultimately operate, as does a mortgage foreclosure, under certain conditions subsequently to divest the donor of his title. Such gifts are upheld, in many cases, if it is satisfactorily proven that the parties intended immediate effect, even though possession is delivered to a third person for the donee, and not to the donee himself, provided the third person is instructed to pay the donor certain income and to deliver the possession of the donated property to the donee upon the death of the donor. Among such cases are: Innes v. Potter, 130 Minn. 320, 153 N.W. 604, 3 A.L.R. 896 (see, particularly, the vast collection of authorities in the excellent annotation to said case in 3 A.L.R., pp. 902–928); Pyle v. East, 173 Iowa 165, 155 N.W. 283, 3 A.L.R. 885; Wall v. Wall, 30 Miss. 91, 64 Am.Dec. 147. Such being the rule, even where *possession* is delivered to a *third person* and is *withheld from the donee* until the donor's death, a fortiori the existence of the trust in the instant case, merely providing for the expenses of the care, illness and funeral of the donor, should not be permitted to defeat the gift, *where possession has passed immediately to the donees,* Questa and Mrs. Gardella, upon the making of the gift, and not to a *third person,* and only the beneficial enjoyment was postponed until death and the completion of the trust.

But were sufficient facts satisfactorily proved by the evidence to establish the gift by Gaminara to Questa and his sister, Mrs. Gardella?

■ We are fully mindful of the close scrutiny and extreme caution enjoined upon the courts in cases where

the establishment of a gift depends upon the testimony of interested parties. This court has repeatedly expressed itself to the effect that to establish such a gift, especially in the absence of written evidence thereof, the evidence must be clear and convincing, and, as stated in some cases, clear, convincing and satisfactory, or clear, convincing and unequivocal. Su Lee v. Peck, 49 Nev. 124, 137, 240 P. 435. In Goldsworthy v. Johnson, 45 Nev. 355, 204 P. 505, Mr. Justice COLEMAN, in his able and scholarly opinion (in which he was referring to gifts causa mortis), stated, on page 369 of 45 Nev., page 509 of 204 P.:

"It matters not much to us what the rule was under the Grecian and Roman jurisprudence, and we call attention to the fact that such gifts seem to have been sanctioned by those systems to show the lack of foundation for the frequent assertion that they are not favored. Because of the ease with which fraud may be perpetrated, they are closely scrutinized and must be established by clear, convincing, and satisfactory proof, but when so established the courts regard them with as much favor as they do a bequest or devise under a will."

The fact is that there is no direct evidence to establish the gift involved in the instant case, other than the testimony of Questa and Mrs. Gardella. We believe it is only fair to bear in mind, however, that it was only by means of their testimony that the fact that Gaminara turned over to them the $12,000, in 1931, and the $4,000 in 1944, could be proved. Likewise, the testimony of Questa was absolutely necessary to establish the trust, the amounts of the expenditures thereunder and the balance remaining. Questa and Mrs. Gardella, in testifying to the receipt of them of these substantial sums of money, and Questa in accounting therefor and showing a balance of more than $5,600, were making admissions against their own interest. Questa furnished vouchers and rendered an account of all of the transactions, so

satisfactorily that James Santini, the executor of Gaminara's estate and the respondent herein, has not questioned their correctness. Moreover, the evidence is clear and convincing that Questa and Mrs. Gardella, during the period of more than three years which ensued after the alleged gift and before Gaminara's death, performed the duties of the trust very faithfully. They scrupulously kept the funds intact and separate from their own, and did not attempt, prematurely, to devote any of the money to their own use, but scrupulously observed the limitations of the trust, deferring any beneficial enjoyment thereof on their part until after Gaminara's death and the payment of his funeral expenses. Questa and Mrs. Gardella are thus clearly and convincingly shown to have administered the trust both honestly and with fidelity. This being true, and it appearing also, as above indicated, that they testified truthfully as to matters adverse to their own interest, and voluntarily assumed all of the responsibilities of the trust when no one else knew the facts as to its creation, it is only fair to believe they testified truthfully as to the gift, even though that particular fact happened to be favorable to their interest. A person who is honest and faithful is likely to be truthful.

What conflict is there, if any, in the evidence? Is there any substantial evidence disproving or refuting the alleged gift?

In our view, the only evidence, if it may be considered such, which may plausibly be claimed as tending to indicate, by inference, that a gift did not occur was Questa's failure, in a conversation with Santini on July 21, 1947, two days after Gaminara's death, to assert any claim to the money as a gift. The important portion of Santini's testimony as to that matter is as follows:

"I asked him to come to see me in view of the fact I had been appointed executor of the will. He said, 'What do you mean "executor of the will"?' I said, 'He drew

up a will, and he wanted me to be the executor. I won't be officially until the Court approves the will.' He said, 'I wish you had told me this sooner.' I said I couldn't because I couldn't until the man died. He said, 'I spent some of my personal money. I bought things with my personal money when there was a Thousand Dollar bill in the can. I didn't want to break that for small purposes.' I said, 'If your expenditures are legitimate, get receipts, and if they are okay, I am sure the Court will approve them.' He said, 'Well, that will take two or three days.' I said, 'I don't care how long it takes.'

"That was the last I saw of him until three or four days later Mr. Boyle called me up and said, 'What about this Gaminara deal?' I said, 'Well, there is a will, and I am the executor.' And Bill intimated that Mr. Questa was displeased with the will."

We do not know why Questa was reluctant, apparently, on that occasion, to make a claim to the money as a gift. It may readily be surmised, however, that being a layman and perhaps not well informed as to legal matters, Questa was confused as to his rights. He knew he had no formal writing making a gift, and upon being informed that there was a will he was taken by surprise. He may have formed the impression that perhaps the executor would have the right to take over the trust money in Questa's hands, regardless of who might ultimately be determined to be entitled to the money. If so, he was naturally concerned as to the fact that same would probably interfere with the payment of certain funds he had recently advanced for Gaminara's needs because he did not want to break a thousand-dollar bill in the can for small purposes. This being the immediate problem, he mentioned it to Santini. It is not surprising that he felt prompted to consult his attorney, Mr. Boyle, before making any claim to the money as a gift, in order to be certain as to his rights. We do not believe that, under the circumstances, the failure of Questa to make a claim, at that time, to the money is

significant, or can fairly be deemed the basis of an inference that there was no gift. Under a somewhat similar situation, the Supreme Court of Iowa, in the case of Pyle v. East, supra, stated as reported on page 890 of 3 A.L.R., 173 Iowa 165, 155 N.W. 286:

"The court below laid some stress upon the fact that after the death of Morris, when Sogard handed the note to East, he handed it back, with the suggestion that he did not wish to do anything which might cast suspicion upon him, and he preferred to have the paper surrendered to him by the administrator or by order of court. It is suggested that the act was in the nature of an admission that he did not claim the note, or did not feel certain of his right in the matter. We can see no reason for looking on his conduct in this respect as an impeachment of his defense in this case. That he was not forward or overeager to insist upon his right is much less suspicious than if he had gone to the other extreme. He was named as executor of Morris' will, but refused to serve, and the fact that he did so and was willing to have his claim pass the scrutiny of the administrator and the court was to his credit, rather than otherwise. Upon the admitted facts the defense to the note was well established, and defendant should have had judgment for costs."

Also, it was brought out by respondent's attorney that in certain conversations in the hospital, when Questa was present, and which occurred two days before Gaminara's death, when, according to Dr. Miniggio's testimony, Gaminara's mental condition was bad, Questa did not assert his rights as to the gift. In one instance, Gaminara answered Mrs. Mortenson, a nurse, affirmatively when she asked how much he had "loaned" Questa. The conceded facts and circumstances of the case refute any theory of a loan. The greater portion of the money had, before then, been expended for Gaminara's benefit, and none for Questa's, which latter admittedly would have been the case had it been a loan.

One "cannot have his cake and eat it too." ·Questa did state to the nurse that such statement was untrue, but, very properly, did not disturb Gaminara in his condition, by entering into any controversy with him. In the other instance, on the same day, Miss Fino, one of Gaminara's nurses and a legatee under the will, told Questa that Gaminara wanted him to bring to the hospital the balance of his money. Strange indeed, it appears, that Gaminara, had he been in his right mind, would, at a time when he was desperately ill, have wished to have assumed the responsibility as to his money and its management, when he wished, three years before, when not seriously ill, to be relieved of such responsibility! This seems especially true in the absence of even a scintilla of evidence that the trust was being improperly administered. Questa merely informed Miss Fino that he had not figured all the expenditures, and did not know if there was any balance, or, if so, the amount of it. The agitation as to money, and the activities of certain participants in these conversations in regard thereto, were very improper and inconsiderate, in view of Gaminara's condition, and the action of Questa in declining to enter into any controversy in the matter and in not asserting any personal claim to the money as a gift, in answer to Miss Fino's demand, was, in view of the circumstances, entirely justifiable and proper.

In the absence of any finding or statement by Judge Maestretti that he disbelieved the testimony of Questa or Mrs. Gardella, either wholly or in part, and in view of the facts proved and the surrounding circumstances, we fail to find any conflict in the evidence, or any substantial evidence disproving or tending to disprove their testimony. To us, the factual background and the surrounding circumstances are materially corroborative of the claim of Questa in this case. Gaminara had no relatives in this country. He had emigrated, in early life, from Italy. He had been employed by Questa's father when Questa was one year old. All through the

years there was strong friendship and close association between Gaminara and Questa and Mrs. Gardella. Mrs. Gardella and her husband had cared for him during a long period, when he was ill, and both Questa and Mrs. Gardella had assisted him frequently in connection with his affairs. Gaminara evidenced great trust and confidence in them when he brought the $12,000 to them for safekeeping. He had, for years before finally coming to live with Questa and Mrs. Gardella, lived alone in his cabin on Bell Street in Reno. He had been having fainting spells, and became fearful of living alone and wished to come and live with Questa and Mrs. Gardella. The reasons were obvious. He needed their care and assistance. It was then, at the very time he proposed coming to live with them, that he brought the other $4,000 and placed that, also, in their hands. He was then placing himself under their care, knew they were to provide him a home in a comfortable house on their premises as long as he lived; that Mrs. Gardella was to cook for him (except breakfast) ; and that, according to the trust expressions he employed, they were to see that he was properly cared for if and when he was ill, and that he was decently buried if he should die during their lifetime. Is it not reasonable to believe that, when he was asking them to assume those responsibilities, he thought they were more entitled to his bounty than any one else? He was then turning the money over to them because he wished to be relieved of responsibility, and felt assured that it would be properly administered and that his needs would be well served. Is it not reasonable to believe that, upon the occasion when he was thus requesting much at the hands of Questa and Mrs. Gardella, he should wish to do something in return for their kindness and generosity? What he did in bestowing the gift upon them under those circumstances was merely the natural gratitude of an honest, just and fair-minded person possessing the natural human attribute which prompts one to reciprocate kindness and generosity.

We are convinced the honorable district judge was in error in his evident conclusion that as a matter of law the evidence was insufficient to establish or create a gift. We have hereinbefore particularized as to such error. In consequence of such misconception as to a matter or matters of law, the learned judge naturally erred in making the said orders from which appeal has been taken.

It has been properly suggested to us that John Questa has died while this appeal was pending, and that Mrs. Gardella has been appointed executrix of his last will and testament and of his estate. We have, therefore, ordered that, as such executrix, Mary Elizabeth Gardella be substituted as the party appellant in the instant case.

It is our decision and order that the decision of the honorable Second judicial district court of the State of Nevada, in and for the County of Washoe, Department 2, in the premises, be reversed; that the said orders appealed from, and each of them, be set aside; and that this proceeding be remanded to said district court and that said court make such order or orders as are necessary and appropriate, ordering that E. H. Beemer, Esq., County Clerk of Washoe County, Nevada, pay to Mary Elizabeth Gardella, as executrix of the last will and testament and the estate of John Questa, deceased, one half of the sum of $5,601.50 now held by him under said order made the 10th day of September 1947, and that he pay to Mary Elizabeth Gardella, personally, the other one half of such sum.

BADT, J., concurs.

EATHER, C. J., because of illness, did not participate in the preparation and rendition of the foregoing opinion.